**UNITED NUCLEAR CORPORATION,
Plaintiff–Appellant,**

v.

**The UNITED STATES,
Defendant–Appellee.**

No. 89–1727.

United States Court of Appeals,
Federal Circuit.

Aug. 24, 1990.

Rehearing Denied Oct. 25, 1990.

Peter J. Nickles, Covington & Burling, Washington, D.C., argued, for plaintiff-appellant. With him on the brief was Steven J. Rosenbaum, Washington, D.C. Also on the brief were Michael W. Brennan and Jon J. Indall, Carpenter, Crout & Olmstead, Santa Fe, N.M., of counsel.

Jacques B. Gelin, Dept. of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief were Richard B. Stewart, Asst. Atty. Gen., Martin W. Matzen, R. Anthony Rogers and Alan Brenner.

Before NIES,* Chief Judge, FRIEDMAN, Senior Circuit Judge, and MAYER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The appellant, United Nuclear Corporation (United), entered into two leases with the Navajo Tribal Council (Tribal Council), which authorized United to conduct uranium mining on land in the Navajo Reservation. The leases were awarded to United through competitive bidding, and the Secretary of the Interior approved the leases, as well as United's exploration plans for the leased land. United's explorations, for which United spent more than $5 million, uncovered valuable uranium deposits. United then prepared a mining plan, which it submitted to the Secretary for approval, such approval being necessary before United could begin mining.

Although United's mining plan satisfied all of the requirements of the Secretary's regulations, the Secretary refused to approve it without tribal approval. During the next three years United unsuccessfully attempted to obtain tribal approval or to persuade the Secretary to approve the mining plan without tribal approval. The result was that United's leases terminated because United failed to begin mining within the period the lease specified. United then filed the present suit in the United States Claims Court alleging that the Secretary's refusal to approve the mining plan constituted a taking of its leases, for which it was entitled to just compensation.

The Claims Court dismissed the suit, holding that United had no "legally protected property right to approval of its mine plan" that was "the subject of a Fifth Amendment taking." *United Nuclear Corp. v. United States*, 17 Cl.Ct. 768, 777, 775 (1989). We hold, however, that there has been a taking of United's property interest in the leases, and remand the case to the Claims Court to determine the amount of just compensation to which United is entitled.

I

A. The basic facts, as found by the Claims Court and as shown by the record, are as follows:

The Navajo Reservation is located in the Grants Mineral Belt, "the premier uranium-producing area" in the United States. 17 Cl.Ct. at 769. Three hundred and thirty million pounds of uranium (approximately 55 percent of all uranium produced in the United States) has come from this area. The potential for uranium mining in this area has been generally recognized since at least the late 1960's, when the Kerr–McGee Corporation had obtained uranium leases from the Tribal Council and conducted substantial exploration. These and other exploratory efforts "strongly suggested that there was a significant potential for uranium to be discovered on areas of the Navajo reservation not covered by the Kerr–McGee leases." *Id.*

The Tribal Council in 1970 unanimously authorized the Secretary of the Interior to conduct public bidding for uranium mining of this area. In sealed bidding, United, a large domestic producer of uranium with extensive mining experience, was the successful bidder for the mining rights on two tracts of the reservation.

On June 29, 1971, United entered into two ten-year leases with the Navajo Tribe (Tribe). The leases were for "a term of 10

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

years from the date of ... approval and as long thereafter as the minerals specified are produced in paying quantities." The leases provided for annual rent, a minimum annual royalty and additional royalties based upon the amount of minerals mined. United paid the Tribe a bonus of $79,000 upon signing the leases, and also paid total rent and royalties of more than $220,000. 17 Cl.Ct. at 770. The Tribe has retained all this money.

On July 7, 1971, the Secretary approved the leases. Such approval was necessary for them to become effective. 25 U.S.C. § 396a (1970); 25 C.F.R. § 171.2 (1971).

The Secretary subsequently approved United's exploration plan, which approval was necessary before United could begin exploration. 25 C.F.R. § 177.6 (1970) (now designated 25 C.F.R. § 216.6 (1989)). United spent $5,366,835 for exploration and related activities. Through this exploration, United discovered more than 20 million pounds of uranium on explored portions of the leased land, and believed there was a potential for 20 million additional pounds on unexplored portions.

Prior to commencing mining operations on the leased lands, United was required to obtain the Secretary's approval of its mining plan. 25 C.F.R. § 177.7 (1971). On February 4, 1977, United submitted its mining plan to the United States Geological Survey (the "Survey"), a Bureau of the Department of the Interior. The Claims Court found that "[t]he mining plan satisfied each of the requirements set forth in the mining plan regulations," 17 Cl.Ct. at 770, and the government concedes that United's "plan satisfied the technical requirements of the Department's regulations." The Regional Mining Supervisor, an Interior Department official who had served in that position since 1960, testified that he had never disapproved any of the hundreds of exploration or mining plans submitted for his approval.

The Claims Court found that although United's mining plan met all the regulatory requirements, the Department "withheld approval of the mining plan for a period of more than 4 years, deferring to the Navajo Tribe approval of the plan." 17 Cl.Ct. at 770. In April 1978, at a meeting between United and Departmental officials, the latter informed United that the Department "was giving the Navajo Tribe a veto power over the mining plan and that the Department and the [Survey] were refusing to take any action on the mining plan until the Tribe approved it." 17 Cl.Ct. at 771.

Tribal approval of mining plans never had been required previously. Only a few months earlier, when Kerr–McGee had sought the Secretary's approval for a mining plan on tribal land that it had leased, the Acting Director of the Survey wrote the Tribal Council that if the Survey did not receive tribal comments regarding Kerr–McGee's plan by a stated date, the Survey would "assume that the [Tribe] concurs with the plan as submitted and [the Survey] will proceed with administrative processing of the mine plan." Letter of the Acting Director of the Survey to Peter McDonald, Chairman, Navajo Tribal Council, dated Feb. 3, 1976.

In a meeting on October 13, 1978, among tribal representatives, Department officials, and United, the General Counsel of the Tribe indicated that a "$10,000,000 adder might be needed" and a member of the Tribe indicated that "it was not enough." It was stated that the Tribe was "[c]oncerned about the depletion of Tribal water resources." The Claims Court found, however, that United "had met necessary environmental impact requirements." 17 Cl.Ct. at 771 n. 10.

The government itself recognized that the Tribe was using its veto power either to require United to pay more money or to cause the leases to lapse. The Chief of the Survey's Branch of Mining Operations wrote in the fall of 1978:

The tribe is withholding comments and concurrence on approval of [United's mining] plan[] in hopes of forcing the lessees to take the tribe on as a partner in the operations. This is real leverage since the tribal leases will expire on July 7, 1981, unless production has commenced in paying quantities.

Moreover, there is testimony indicating that the Bureau of Indian Affairs also was aware that the Tribe was withholding approval because "the tribe wanted more bucks, more money." From the time of the April 1978 meeting, when United first was informed of the tribal approval requirement, United "made repeated and continuous efforts to gain such tribal approval ... [and] sought to convince the Secretary to withdraw the requirement of tribal approval of the mining plan." 17 Cl.Ct. at 771. Neither endeavor succeeded.

Following an unsuccessful judicial attempt by United to compel the Secretary (1) to approve or act upon the mining plan, or (2) to extend the leases, *United Nuclear Corp. v. Watt*, 17 ERC 1643 (D.D.C.1982), the leases expired as of July 7, 1981, because of United's failure to begin mining.

B. On May 4, 1984, United filed a complaint in the United States Claims Court alleging that the Secretary's failure to approve the mining plan constituted a taking of United's property without just compensation, in violation of the fifth amendment, and seeking damages.

After a trial, the Claims Court dismissed the complaint. The court first held that the suit was timely filed within six years of the alleged taking. It ruled that the date of the alleged taking was October 1, 1978, which it found was the date on which under normal conditions United's mining operations would have commenced. 17 Cl.Ct. at 772.

> On the merits, the court held that
> the property right which is the subject of this taking claim is not the leases. What is the subject property is UNC's expectation that it would be permitted by defendant to engage in mining the leased tracts. According to *Allied–General [Nuclear Services, Inc. v. United States,* 839 F.2d 1572 (Fed.Cir.1988) ], this is not a legally protected property right which can be the subject of a Fifth Amendment taking.

*Id.* 17 Cl.Ct. at 775.

> The court concluded that United
> had no legally protected property right to approval of its mining plan as against the

declaration of policy to assure maximum participation by Indians in their affairs where the federal Government is involved.

17 Cl.Ct. at 777.

## II

The determination whether government action constitutes a taking of property under the fifth amendment rather than a mere exercise of the government's regulatory authority frequently is a close, difficult, and complex process. In *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), the Supreme Court noted that while its cases "have eschewed the development of any set formula for identifying a 'taking' forbidden by the Fifth Amendment, and have relied instead on ad hoc, factual inquiries into the circumstances of each particular case," there are "three factors which have 'particular significance' " "[t]o aid in this determination": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Id.* at 224–25, 106 S.Ct. at 1025–26. *See also Atlas Corp. v. United States*, 895 F.2d 745, 756–57 (Fed.Cir.1990); *United States v. One (1) 1979 Cadillac Coupe de Ville*, 833 F.2d 994, 1000 (Fed.Cir.1987).

1. *The Economic Impact of the Regulation on the Claimant.* As the Claims Court found, the economic impact of the regulation (giving the Tribe a veto power over the mining plan) upon United "has been severe." 17 Cl.Ct. at 773. United has paid the Tribe approximately $300,000 as a bonus for the leases and as rent and minimum royalties. It also expended more than $5 million in exploration and related activity. It is unlikely that United will be able to recover any of this money.

Equally or perhaps more significant, United's exploration indicated that a substantial amount of uranium existed on the leased land. The extraction and sale of this uranium by United presumably would

have produced significant profits for the company. The Secretary prevented United from commencing mining operations by refusing to approve United's mining plan, thus causing the leases to expire. As a result, United lost whatever profits it would have made had it been permitted to mine the leased land.

2. *The Extent to Which the Regulation Has Interfered With Distinct Investment–Backed Expectations.* United invested more than $5 million in the project and presumably expected to derive substantial profits from the venture. Prior to the April 1978 meeting with Departmental officials, United had no indication or even suggestion that tribal approval of the mining plan would be required before the Secretary would approve it. Indeed, previously tribal approval of mining plans had not been required. United's mining plan concededly satisfied the requirements of the applicable regulations. Prior to the meeting, United justifiably believed and expected that if its mining plan met the requirements, the Secretary would approve it—as he had done for United's exploration plan.

Although the Claims Court recognized that United had these expectations, it held that the expectations were not reasonable because "[i]t would have been reasonable and prudent for [United] to question at the outset whether rules, regulations and requirements under the existing scheme, to which it voluntarily submitted itself, would change during the 10–year term of its lease." 17 Cl.Ct. at 775. The court referred to a provision of the leases that required United to abide by and conform to the leases "and all regulations of the [Secretary] now or hereafter in force and relative to such leases...." *Id.*

The Secretary's new requirement of tribal approval of the mining plan was not adopted or included in any regulation of the Secretary. If the Secretary had proposed such a regulation, United would have had the opportunity to oppose it. Indeed, at one point the Secretary had proposed (although never adopted) a regulation, applicable only to future and not to existing leases, Proposed § 177.2(c), that required

only that the "Mining Supervisor shall be available to consult with the Indian mineral owner before acting to approve or disapprove any such plan," Proposed § 177.5, and not that the plan be approved by the tribe. Dep't of Interior, *Mining on Indian Lands, Proposed Rules*, 42 Fed.Reg. 18,083, 18,088–89 (Apr. 5, 1977).

The fact that United agreed that the leases would be subject to future regulations does not indicate that United fairly can be said to have anticipated that the Secretary would apply a new policy requiring tribal approval of mining plans to leases entered into almost six years earlier, in reliance on which United had expended some $5 million.

The Claims Court held, however, that the Secretary's decision had not interfered with United's investment-backed expectations because the property "right" that United alleges was taken was "not the leases," but United's "expectation that it would be permitted by defendant to engage in mining the leased tracts." 17 Cl.Ct. at 775. Relying upon *Allied–General,* the court reasoned:

It was not a reasonable investment-backed expectation that merely achieving technical adequacy of the mine plan under the regulations automatically *required* Secretarial approval of [United's] mine plan ministerially. A sophisticated company like [United], schooled in the vicissitudes of Government, should have reasonably contemplated the possibility of Government inaction and delay.

The Court believes it was reasonable for [United], in dealing with the Navajos and the Government, to assume that there would be tribal involvement in the mine plan decisionmaking process when weighed against the trust responsibilities of the Secretary created by the Indian Mineral Leasing Act of 1938 (25 U.S.C. §§ 396a–396f) and the Government's policy of Indian Self–Determination which had its origins in a policy statement by President Nixon in 1970 which, in turn, culminated in the enactment of the Indian Self–Determination and Education Assistance Act, 25 U.S.C. §§ 450, *et seq.,*

some 2 years before [United] submitted its mine plan to [the Survey] for approval.

*Id.* at 776 (emphasis in original).

In part 3 below, we explain why *Allied–General* is significantly different from, and therefore does not control, this case. Here we note only that the property interest that is the subject of the taking claim is United's leasehold interest in the minerals, which the government took by preventing United from mining under the leases, and not the mere expectation that United would be permitted to engage in mining. Contrary to the ruling of the Claims Court, we hold that the Secretary's refusal to approve the mining plan seriously interfered with United's investment-backed expectations by destroying them.

3. *The Character of the Governmental Action.* When the Interior Department officials first informed United that tribal approval was required for the mining plan, they gave no reason for or explanation of that decision. The Claims Court specified two factors that it believed explained the Secretary's decision: "[T]ribal concerns about potential reduction of scarce drinking water supplies in an arid region and the addition of another major uranium mining operation to an already large number of such mines operating in an area which could not handle the burgeoning population and increased traffic that would impact the area." 17 Cl.Ct. at 777. The court also noted that United "had met necessary environmental impact requirements," *id.* at 771 n. 10—a finding that seemingly undercuts and perhaps vitiates the court's speculation regarding the reasons for the Secretary's decision.

The record leaves no doubt that the real reason for the Tribe's refusal to approve United's mining plan was an attempt to obtain substantial additional money from United. The general counsel of the Tribe indicated at a meeting that an additional $10 million would be necessary. Interior Department officials were aware that the Tribe's true motive for refusing to approve the mining plan was that the Tribe "wanted ... more money." This fact, which the Claims Court did not mention, is inconsistent with that court's view that the reason the Tribal Council would not approve the mining plan was "tribal concerns regarding potential loss of the Tribe's drinking water supplies and the cumulative effects of the proliferation of uranium mines in the area," 17 Cl.Ct. at 777, since these concerns apparently would have disappeared if United had paid the Tribe substantial additional money.

In its brief before us, the government asserts that the Secretary's requirement of tribal approval of the mining plan was intended to promote the Indians' right to and development of self-determination. It is difficult to understand, however, how encouraging the Indians not to live up to their contractual obligations, which they entered into freely and with the Secretary's approval, could be said to encourage self-determination. To the contrary, one would think that the best way to make the Indians more responsible citizens would be to require them to live up to their contractual commitments.

The present case is very different from *Allied–General.* In that case a company had constructed a plant for reprocessing used nuclear fuel. While the Nuclear Regulatory Commission was considering the company's application for an operating permit for the plant, the President barred the operation of any reprocessing plants because of concern that permitting the plant to operate could lead to a proliferation of nuclear weapons that could threaten the safety of the United States.

The Claims Court dismissed a suit for just compensation based on the government's alleged taking of the plant. This court affirmed, holding that "the claimant had no legally protected property right to operate the plant, which could have been the subject of a fifth amendment taking, as against the fear it would injure the national security." 839 F.2d at 1573. This court applied "the basic rule ... that as against reasonable state regulation, no one has a legally protected right to use property in a manner that is injurious to the safety of the general public." *Id.* at 1576 (citing

*Mugler v. Kansas,* 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887)).

The Secretary's requirement of tribal consent in the present case is a far cry from the kind of Presidential power invoked in *Allied–General.* The Secretary's action reflects not concern over national safety, but an attempt to enable the Tribe to exact additional money from a company with whom it had a valid contract, which the government euphemistically describes as an attempt to encourage and promote Indian self-determination. The considerations upon which the court based its decision in *Allied–General* are inapplicable here. *See also Atlas Corp.,* 895 F.2d 756–58 (federal statute requiring uranium producers to take costly action to decontaminate production sites and stabilize residue from uranium production known as "tailings," not a taking where Congress determined that the tailings were "potentially hazardous to the public health").

## CONCLUSION

We hold that there was a taking, and accordingly reverse the judgment of the Claims Court dismissing the complaint. The case is remanded to that court to determine the just compensation to which United Nuclear Corporation is entitled. In so remanding, we indicate no views concerning the basis upon which just compensation is to be determined or the amount to be awarded.

REVERSED and REMANDED.

NIES, Chief Judge, dissenting.

I respectfully dissent. In my view, the alleged appropriation of United Nuclear Corporation's mining rights (1) is not the responsibility of the United States, and (2) does not constitute a regulatory "taking" under the standard of *Connolly v. Pension Benefits Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986).

## I

*United's Dispute Is With The Navajos*

Stripped of irrelevancies, the facts are that United Nuclear Corporation entered into leases with the Navajo Tribe which entitled United to enter on certain tribal lands and to mine uranium. United's "rights" in such leases vis-a-vis the Navajos, are enforceable, according to United's counsel, only in Navijo Tribal Courts. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 65–66, 98 S.Ct. 1670, 1680–81, 56 L.Ed.2d 106 (1978) and cases cited therein. ("Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians.") United first attempted to litigate this dispute in the U.S. District Court for the District of Columbia against the United States and the Navajo Tribe seeking an extension of the lease term and damages. The tribe asserted sovereign immunity. The court concluded, *inter alia,* that United could not "defeat the Navajo's sovereign immunity," particularly with respect to "control of its natural resources," by "reliance on a commercial exception, due process or compensation principles." *United Nuclear Corp. v. Clark,* 584 F.Supp. 107, 110–11 (D.D.C. 1984). Accordingly, the case was dismissed. No appeal was taken.

United totally ignores tribal laws although such law is the fundamental basis for United's asserted property rights. As the Supreme Court has said, "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus v. Monsanto,* 467 U.S. 986, 1001, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984) *Cf. Langenegger v. United States,* 756 F.2d 1565, 1572–73 (Fed. Cir.), *cert. denied,* 474 U.S. 824, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985) ("It is our view that one who owns land in a foreign country looks to the laws of that country to determine his incidents of ownership including his rights in the event of expropriation.") Here, United's leasehold rights are dependent on tribal law. United has not established what is the scope of leasehold rights that the Navajos recognize in a private non-Indi-

an party as against the sovereign Tribe. If United's rights were defeasible, for example by reason of legitimate Tribal concerns for the environment, United may have no *property rights* that could be taken.[1]

Unlike the majority, I do not know the reasons the Navajos did not approve the mining plan. It could have been because the Tribe wanted more money, as the majority finds, or its concern for its water supply and fear of the hazards of uranium mining, as the Claims Court suggested (*United Nuclear Corp. v. United States*, 17 Cl. Ct. at 768, 771 n. 10 (1989)), or simply a desire to preserve its patrimony. The leases, for example, were renewable in perpetuity.[2] The reason is immaterial to a taking claim against the United States, and in any event, the tribe's motive is beyond judicial inquiry. As stated in *Langenegger*:

> Consideration of El Salvador's motives for expropriation is not the central focus of a claim alleging a taking by our country. To the extent that such motivation may be pertinent, we find that the relevant facts reside in what that government "purported" to do. If the "purported" reasons for action are not the

real reasons, we think the matter is not one the judicial bench can correct; a subjective determination of a government's motive is beyond judicial inquiry.

756 F.2d at 1569-70.

What is material here is that any claim that United may have is against the Navajos in accordance with the law recognized in their tribal courts.[3] United has not pursued that avenue. Its excuse for not doing so is that it does not wish to sue the Navajos in tribal courts. United prefers to sue the United States in its "tribal court," the U.S. Claims Court, on a strained theory that the United States has "taken" its leasehold interest by "giving" the Navajos a "veto" power over mining plans proposed for the Navajo's sovereign lands.

At most, the Secretary facilitated the Navajo's exercise of inherent sovereignty. Because of the Secretary's deference, the Navajos, simply by doing nothing, effectively prevented United from obtaining approval of its mining plan from the Secretary. However, there is no evidence that "but for" the Secretary's deference to the Tribe, mining would have proceeded. Ap-

---

1. The fact that United submitted an environmental impact statement which the Secretary approved does not restrict the Tribe from imposing stricter environmental standards than federal standards. *See* F. Cohen, *Handbook of Federal Indian Law*, p. 538 (1982 ed.).

2. The terms of the lease provided a fixed rate schedule for royalties and for renewal so long as the lessee produced "the minerals specified in paying quantities." The record also indicates that United did not attempt to work matters out with the Tribe and that the Tribe took offense at United "going to Washington" rather than dealing directly with the Tribe.

3. *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981):

> Indian Tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. *Williams v. Lee, supra,* [358 U.S. 217] at 223 [79 S.Ct. 269, 272, 3 L.Ed.2d 251]; *Morris v.*

*Hitchcock,* 194 U.S. 384 [24 S.Ct. 712, 48 L.Ed. 1030]; *Buster v. Wright,* 135 F. 947, 950 (CA8); *see Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152-154 [100 S.Ct. 2069, 2080-2082, 65 L.Ed.2d 10]. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. *See Fisher v. District Court,* 424 U.S. 382, 386 [96 S.Ct. 943, 946, 47 L.Ed.2d 106]; *Williams v. Lee, supra* [358 U.S.], at 220 [79 S.Ct. at 270]; *Montana Catholic Missions v. Missoula County,* 200 U.S. 118, 128-129 [26 S.Ct. 197, 200-201, 50 L.Ed. 398]; *Thomas v. Gay,* 169 U.S. 264, 273 [18 S.Ct. 340, 343, 42 L.Ed. 740]. *Id.* 450 U.S. at 565-66, 101 S.Ct. at 1258-59.

> No such circumstances, however, are involved in this case. Non-Indian hunters and fishermen on non-Indian fee land do not enter any agreements or dealings with the Crow Tribe so as to subject themselves to tribal civil jurisdiction.

*Id.* at 565-66, 101 S.Ct. at 1258-59 (footnote omitted). *Montana* was recently reaffirmed and cited in *Duro v. Reina,* —— U.S. ——, 110 S.Ct. 2053, 2061, 109 L.Ed.2d 693 (1990).

proval of the mining plan was required *before* mining, but whether *a tribal court* would have held United was entitled to mine once it obtained the Secretary's approval, we have no idea.

In any event, after securing mining plan approval, United had to obtain approval *from the Navajos* to build roads, put in power lines, and construct other necessary production facilities. It is difficult to rationalize in a real world setting that the *Secretary* "destroyed" the leasehold and caused United's loss of profit by not approving United's mining plan. If the Navajos wanted to stop mining or make it unprofitable (*e.g.*, by taxing United), they had the power to do so, regardless of what the Secretary did with respect to the mining plan. *See Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152, 100 S.Ct. 2069, 2080, 65 L.Ed.2d 10 (1980) (power to tax is "fundamental attribute of sovereignty which the tribes retain.")

The point of this analysis is that exploitation of United's leasehold interest was dependent on the cooperation and law of the Navajos. That the consent of the Secretary was necessary to obtain the lease and to proceed at various stages does not change the fact that United's lease is with the Navajos and concerns tribal lands. *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 372, 88 S.Ct. 982, 985, 19 L.Ed.2d 1238 (1968) (although approval of Secretary is required, "he is not the lessor" of Indian lands). United's dispute, like its lease, is with the Navajos. The acts, or more precisely inaction, which directly caused United's leasehold interests to become valueless were those of the Navajo Tribe.

I recognize that precedent does support the proposition that the United States may be held responsible for a taking even where its acts are not the final direct cause of the property loss. *Langenegger*, 756 F.2d at 1570; *Aris Gloves, Inc. v. United States*, 190 Ct.Cl. 367, 372, 420 F.2d 1386, 1391 (1970), *Turney v. United States*, 126 Ct.Cl. 202, 115 F.Supp. 457 (1953). However, in a comparable situation, the Supreme Court has said, "[A] determination must be made

whether the [federal] government involvement in the deprivation of private property is sufficiently direct and substantial to require compensation under the Fifth Amendment," *National Bd. of YMCA v. United States*, 395 U.S. 85, 93, 89 S.Ct. 1511, 1516, 23 L.Ed.2d 117 (1969). In this case, there is no justification for attributing the acts of the Tribe to the United States. The record is wholly devoid of evidence that the United States encouraged or even suggested, much less required, that the Navajo Tribe should withhold approval of the mining plan. *Cf. Fern v. United States*, 908 F.2d 955 (Fed.Cir.1990) (United States not liable for action taken by states following enactment of statute removing preemption).

In *Langenegger*, no taking by the United States was found upon expropriation of property of U.S. citizens by El Salvador despite the active encouragement of such action by the United States. There, this court held that its determination of whether the United States' involvement was "sufficiently direct and substantial" to warrant fixing responsibility on the United States must be "premised upon the sum of two factors: (1) the nature of the United States' activity, and (2) the level of the benefits the United States has derived." *Langenegger*, 756 F.2d at 1572. The "activity" of the United States in *Langenegger* was a change in our foreign policy towards El Salvador which encouraged land reform; here, it was a change in our policy towards Indian tribes which encouraged their self-determination. In both cases, the United States derived no actual benefit from the "taken" property itself. Rather, it merely enjoyed a nebulous improvement in relations with another sovereign.

Judged by the *Langenegger* two-part standard, the nature of the acts of the United States and the level of benefits it accrued do not rise to the level of a "substantial and direct" involvement in the appropriation of United's lease by the Navajos. Under these circumstances, the United States is not responsible for the acts of the Tribe, and thus, there is no taking of United's property *by* the United States. *Accord Erosion Victims of Lake Superior Regulation v. United States*, 833 F.2d 297

(Fed.Cir.1987) (no "direct or substantial involvement" under *Langenegger* test by United States where international organization exercised own discretion in action which injured landowners).

## II

### *No Regulatory Taking*

If one adopts the view of the majority that the United States is the responsible party for causing United's loss here, I would nevertheless hold that United has failed to meet the legal standard set forth by the Supreme Court for determining that a governmental action has transgressed the boundaries of an uncompensable "regulation" and, therefore, must be viewed as a compensable "taking." As set forth by the majority, the factors to be weighed in determining a taking are the character of the governmental action, its economic impact and its interference with reasonable investment-backed expectations. *Connolly*, 475 U.S. at 224–25, 106 S.Ct. at 1025–26; *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980); *United States v. (1) 1979 Cadillac Coupe de Ville*, 833 F.2d 994, 1000 (Fed.Cir.1987). It is to the last of these three factors that I principally direct this part of my opinion because the weight of this factor is so overwhelming here that it controls the taking issue. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1005, 104 S.Ct. at 2874; *United States v. (1) 1979 Cadillac Coupe de Ville*, 833 F.2d at 1000. In contrast to the majority, I agree with the Claims Court that the Secretary's failure to approve the mining plan unless the Tribe also approved did not interfere with any reasonable investment-backed expectation of United.

The majority holds that United had distinct investment-backed expectations in that "[p]rior to the April 1978 meeting with Departmental officials, United had no indication or even suggestion that tribal approval of the mining plan would be required before the Secretary would approve it." Even assuming United had no prior indication or suggestion, the inquiry does not end there. The circumstances sur-rounding this case provide no basis for United to have had reasonable investment-backed expectations that it would be able to mine uranium under its leases with the Navajo Tribe merely because its mining plan was technically adequate under applicable regulations. The regulation with respect to mining plan approval, 25 C.F.R. § 177.7 (1978), did not guarantee *mining*. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. at 1008, 104 S.Ct. at 2875 (no investment-backed expectation that data submitted to EPA would remain confidential absent explicit assurance). Any expectation under the circumstances was precatory at best.

Nor did the United States guarantee or give assurance of the Tribe's performance under the leases. In *Monsanto*, the Court held that a governmental action does not interfere with a reasonable investment-backed expectation if the party claiming the taking was aware of and subject to a statutory scheme that did not provide any assurance that such expectations were reasonable. 467 U.S. at 1007, 104 S.Ct. at 2875. The majority does not address what in the record here establishes that the United States accepted the burden of the uncertainty which United assumed by contracting with another entity. *Cf. Allied–General Nuclear Servs. v. United States*, 839 F.2d 1572, 1573–74 (Fed.Cir.) *cert. denied*, 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988) ("[W]e note an entire absence of any evidence that the government in any manner, express or implied, contracted to share whatever risks there might be in the venture, to warrant that it would succeed, or otherwise shield it against vicissitudes.")

Moreover, the regulations on which United relies as the basis for its investment-backed expectation were subject to change. Specifically, the express language of paragraph XVII of the leases required United to abide by and conform to "all regulations of the Secretary of the Interior now or hereafter in force and relative to such leases." As the Claims Court pointed out, "[t]he express language of paragraph XVII makes it clear that the Secretary as trustee for the lessor expressly reserved the right

to make changes, additions or modifications to the existing regulations which could affect the leases." *United Nuclear Corp. v. United States,* 17 Cl.Ct. at 775–76. The Secretary did not adopt the change in policy here by formal rulemaking procedures. That was deemed not necessary because the regulations at all times required the Secretary "to consult" with the Tribe. *See* 25 C.F.R. § 177.12 (1978). The Secretary merely expanded that consultation.[4] The point is, however, that these regulations provide a shaky foundation for United's assertion of a reasonable investment-backed expectation.

Further militating against the existence of a reasonable investment-backed expectation is the longstanding statutory, regulatory, and jurisprudential backdrop concerning Indian affairs within which United placed itself by leasing rights on tribal lands. Under the Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, Congress entrusted the Secretary of the Interior with the responsibility of considering the best interests of the Indians when making any decision involving leases on tribal lands. *See United Nuclear Corp. v. United States,* 17 Cl.Ct. at 776; *see also,* 43 U.S.C. § 1457(10) (1982); 25 U.S.C. § 2 (1988); 25 C.F.R. §§ 171–77. In effectuating the trust responsibilities, the Secretary has broad discretion in choosing the manner in which to protect the best interests of Indian lessors. *See Kenai Oil & Gas, Inc. v. Department of the Interior,* 671 F.2d 383, 387 (10th Cir.1982). Also having potential effect on Indian mining activity was the government's policy of fostering Indian self-determination which predated United's signing of the leases. That policy began with an announcement by President Nixon and was effectuated in the passage of the Indian Self–Determination and Education Assistance Act, Pub.L. No. 93–638, 25 U.S.C. §§ 450 *et seq.*

I find the present complaint of a taking much less persuasive than that made in *Allied–General Nuclear Servs.* Allied–

General had invested $200 million in building a reprocessing plant for processing spent fuel from nuclear power facilities under a construction license from the Nuclear Regulatory Commission. President Carter concluded that the foreign policy position of the United States against nuclear proliferation was undermined if the United States built such plants which produced plutonium, a component of nuclear weapons. Thus, the United States denied Allied–General an operating license and made its plant worthless. This court found that no taking of property occurred, *inter alia,* because Allied–General accepted the regulatory scheme under which the licensing agency was "required to take into account the common defense and security of the nation." *Allied–General Nuclear Servs.,* 839 F.2d at 1577.

The majority distinguishes *Allied–General* on the basis that the governmental action there was tied to concern over "national safety" whereas here the Secretary's action was "an attempt to enable the Tribe to exact additional money from a company with whom it had a valid contract." Not only is this original factfinding by the majority based on snippets of testimony that the Tribe had this motive, but also there is no evidence that the Secretary's intent was so sinister. In any event, the particular purpose of the governmental action is not of legal import. In both cases the governmental action was permissible, being rationally related to a legitimate government interest, and in both cases a reasonable investment-backed expectation was lacking because of the regulatory scheme. *See Ruckelshaus v. Monsanto Co.,* 467 U.S. at 1007, 104 S.Ct. at 2875. Moreover, *Allied–General* makes clear that United's ability to foresee the specific approval requirement is not dispositive. *Allied–General Nuclear Servs.,* 839 F.2d at 1577.

The majority presumes that United has suffered a severe economic impact which is not otherwise compensable. Again, we

---

**4.** Moreover, United does not, as it cannot in a taking case seeking compensation, challenge the action of the Secretary as substantively or procedurally improper. *See Florida Rock Indus.,*

*Inc. v. United States,* 791 F.2d 893, 899, 905 (Fed.Cir.1986) *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987).

simply do not know. United failed to pursue a breach of contract or unjust enrichment claim against the Navajo Tribe. United counsel's assumption that suit in a Navajo Tribal Court would have been a futile gesture is untenable. As held by the district court in prior proceedings between these parties, due process is not violated by this being the sole remedy. *United Nuclear Corp. v. Clark,* 584 F.Supp. at 110. Moreover, the exhaustion of United's Tribal Court remedy is required before a claim that it has suffered a loss has any credibility. *Cf. National Farmers Union Ins. Co. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985). It is worth noting that other lessees who entered into uranium mining leases with the Navajos were able to work out settlements of similar problems with the Tribe.

## III

### *Conclusion*

The Supreme Court reaffirmed in *Connolly* that the purpose of forbidding uncompensated takings of private property for public use is to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole. 475 U.S. at 227, 106 S.Ct. at 1027. I am unpersuaded that United has shown any reason to receive compensation from the people of the United States because the Navajos frustrated United's desire to secure permanent mining leases on Navajo lands.

For all the above reasons, I would affirm.