# United States Court of Appeals for the Federal Circuit

2008-5058

PALMYRA PACIFIC SEAFOODS, L.L.C.,
PALMYRA PACIFIC ENTERPRISES, L.L.C.,
PPE LIMITED PARTNERSHIP, and FRANK SORBA,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Michael A. Johnson, Arnold & Porter LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Alexea R. Juliano, and James K. Rideout.

Maame A.F. Ewusi-Mensah, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Jeanne E. Davidson, Director, and Mark A. Melnick, Assistant Director. Of counsel was Marla T. Conneely, Attorney. Of counsel on the brief was Mariel J. Combs, Attorney, Office of the Solicitor, United States Department of the Interior, of Portland, Oregon.

Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

2008-5058

PALMYRA PACIFIC SEAFOODS, L.L.C.,
PALMYRA PACIFIC ENTERPRISES, L.L.C.,
PPE LIMITED PARTNERSHIP, and FRANK SORBA,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims
in 07-CV-035, Judge Christine O.C. Miller.

_____

DECIDED:  April 9, 2009
_____

Before BRYSON, GAJARSA, and MOORE, <u>Circuit Judges.</u>

BRYSON, <u>Circuit Judge</u>.

Palmyra Atoll is a tiny island in an empty portion of the Pacific Ocean.  It is approximately 4.6 square miles in area and is located about 1100 miles south of Hawaii and 1400 miles north of Samoa.  There is almost nothing else in between.  As the Supreme Court aptly put it, "It is hard to conceive of a more isolated piece of land than Palmyra."  <u>United States v. Fullard-Leo</u>, 331 U.S. 256, 280 (1947).

During World War II, the United States established a naval base there, where it constructed an airstrip, a base camp, and a pier.  After the war the United States sued

to quiet title to Palmyra, but the Fullard-Leo family successfully opposed the effort and obtained fee simple title to the island.  Fullard-Leo, 331 U.S. at 280.  This case involves a claim brought by parties who wished to use the island as a commercial fishing base and who contend that the government impermissibly interfered with their fishing business by designating the waters around Palmyra as a wildlife refuge.

I

Prior to the events at issue in this case, the plaintiffs obtained from the Fullard-Leo family the right to use certain facilities on Palmyra.  The rights were conveyed through a series of contracts, beginning with a contract in which the Fullard-Leo family granted the Palmyra Development Company the right to convey an exclusive license to establish a commercial fishing operation on the atoll.  The Palmyra Development Company then entered into a licensing agreement with Palmyra Pacific Enterprises, L.L.C.  That agreement granted Palmyra Pacific Enterprises the exclusive right to establish a commercial fishing operation on Palmyra and to use the island's facilities for that purpose.  Subsequently, Palmyra Pacific Enterprises assigned its rights to PPE Limited Partnership, which in turn assigned its rights to Palmyra Pacific Seafoods, L.L.C. ("PPS").

The pertinent provisions of the contract between Palmyra Development Company and Palmyra Pacific Enterprises conveyed to Palmyra Pacific Enterprises "the exclusive right and license to occupy, use and enjoy" the base camp on the atoll as well as "the exclusive right to use the Small Boat Harbor," and "the exclusive right to use one-half of the deep water dock."  The contract also granted a "Commercial Fishing License" purporting to give Palmyra Pacific Enterprises an exclusive right to fish in the

waters surrounding Palmyra as well as a non-exclusive "Aircraft Runway License" for use of the island's airstrip.

The plaintiffs assert that the right to establish a commercial fishing operation is valuable because Palmyra is surrounded by a 200-nautical-mile Exclusive Economic Zone ("EEZ") from which foreign fishing vessels are excluded. Palmyra is the only place within the EEZ where it is practical to locate a commercial fishing operation. According to the plaintiffs, the exclusive use of the island and its airstrip affords a material competitive advantage over any competing fishing enterprises that might operate in the region.

In 2000, The Nature Conservancy, a non-profit entity, purchased much of the emergent land on Palmyra from the Fullard-Leo family. Beginning some time prior to July 2000, the Fish and Wildlife Service of the Department of the Interior began working with The Nature Conservancy to establish a nature preserve and eco-tourism camp at Palmyra. The plaintiffs allege that the government and The Nature Conservancy were concerned about the effect that PPS's commercial fishing operation would have on the proposed eco-tourism camp and accordingly sought to interfere with PPS's operation. According to the plaintiffs, the ensuing government action flowed from the desire to support The Nature Conservancy's efforts.

On January 18, 2001, the Secretary of the Interior signed an order designating Palmyra's tidal lands, submerged lands, and surrounding waters out to 12 nautical miles from the water's edge as a National Wildlife Refuge. Subsequently, the Department of the Interior published a regulation providing for the management of the refuge. 66 Fed. Reg. 7660-01 (Jan. 24, 2001). The regulation states, in pertinent part:

We will close the refuge to commercial fishing but will permit a low level of compatible recreational fishing for bonefishing and deep water sportfishing under programs that we will carefully manage to ensure compatibility with refuge purposes. . . . Management actions will include protection of the refuge waters and wildlife from commercial fishing activities.

In March 2003, The Nature Conservancy conveyed 416 acres of the emergent land of Palmyra to the United States to be included in the refuge. It subsequently added 28 more acres to the conveyance.

In January 2007 the plaintiffs filed a complaint in the Court of Federal Claims alleging that the Interior Department regulation had "directly confiscated, taken, and rendered wholly and completely worthless" their property interests "embodied and reflected" in their licenses. The government moved to dismiss the complaint for failure to state a claim, and the court granted the motion.

The court noted that the Interior Department regulation was directed only to the "tidal lands, submerged lands, and waters" surrounding Palmyra, and that the Fullard-Leo family lacked authority to grant a license governing activities, including fishing, in those areas. Palmyra Pac. Seafoods, L.L.C. v. United States, 80 Fed. Cl. 228, 232 (2008). To the contrary, the court explained, the plaintiffs' interests permitted them only "to use the emergent land of Palmyra for the purpose of establishing a commercial fishing operation." Id. at 233. The court accepted the plaintiffs' assertion that the government's "closure of the waters surrounding Palmyra to commercial fishing frustrated the purpose of the licenses." Id. Because the plaintiffs had acquired no right to engage in commercial fishing in that area, however, the court held that the government's action "did not appropriate a contractual right to commercial fishing granted [by the licenses] as such a right could not have been granted." Id. Even

assuming that the plaintiffs' licenses constituted property interests that would be cognizable in a takings action, the court concluded that the plaintiffs had "failed to allege that the Government's designation of the Palmyra National Wildlife Refuge and closure of the refuge to commercial fishing directly regulated operations under those licenses," and thus no taking of the plaintiffs' licenses had occurred. Id. at 236. Because the plaintiffs had not "asserted a cognizable property interest subject to the government action sufficient to support a takings claim under the Fifth Amendment," the court ruled that they had failed to state a claim upon which relief could be granted. Id. The plaintiffs appealed that ruling to this court.

II

The basic principles governing takings analysis are well settled and are not in dispute here. First, in order to have a cause of action for a Fifth Amendment taking, the plaintiff must point to a protectable property interest that is asserted to be the subject of the taking. See Phillips v. Wash. Legal Found., 524 U.S. 156, 164 (1998) ("Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'") (citation omitted). Second, contract rights can be the subject of a takings action. See, e.g., Lynch v. United States, 292 U.S. 571, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state or the United States."); see also United States v. Petty Motor Co., 327 U.S. 372, 381 (1946) (holding that plaintiff was entitled to compensation for government's taking of option to renew a lease).

The parties disagree about the application of those general principles to the facts of this case. The plaintiffs argue they are entitled to compensation because the government's regulation was targeted at their commercial fishing operation and "effectively transferred PPS's property—its rights under the contract—back to PPS's contractual counterparty, the politically favored and powerful Nature Conservancy." The government, on the other hand, contends that it did not "take" any contract right of the plaintiffs and that any injury that the plaintiffs suffered as a result of the Interior Department regulation was a consequence of lawful government action and did not reflect the taking of any property right obtained by the plaintiffs through contract.

As a general matter, the government does not "take" contract rights pertaining to a contract between two private parties simply by engaging in lawful action that affects the value of one of the parties' contract rights. The Supreme Court's decision in Omnia Commercial Co. v. United States, 261 U.S. 502 (1923), has long stood for that proposition. In Omnia, the federal government requisitioned all of the steel produced by the Allegheny Steel Company. Because Omnia had a contract to purchase steel from Allegheny, which was frustrated by the government's requisition, Omnia brought suit against the government for the purported "taking" of its contract. The Supreme Court held that there was no taking. The Court made clear that when a party alleges that a contract has been taken, courts should distinguish between the claimed taking of the subject matter of a contract and the taking of the contract itself, and it held that a showing that the subject matter of a contract has been taken is not sufficient to demonstrate that the contract itself has been taken. The Court described the government's requisition of the steel underlying the contract as a taking of the subject

2008-5058                                        6

matter of the contract and made clear that by taking that subject matter the government did not take the contract. On the other hand, the Court explained, when there has been an "acquisition of the obligation or the right to enforce it" by the government, the government's action would qualify as a taking of contract rights. Omnia, 261 U.S. at 511.

The Court applied that framework the following year when it considered a Presidential order to appropriate a contract to build a ship under the Emergency Shipping Act. In that case, Brooks-Scanlon Corp. v. United States, 265 U.S. 106 (1924), the Court found that the government had taken the claimant's contract. The Court explained:

> [T]he orders given the builder show that expropriation of claimant's contract and rights was intended. By its orders it put itself in the shoes of claimant and took from claimant and appropriated to the use of the United States all the rights and advantages that an assignee of the contract would have had. The credit for, and advantages under the contract resulting from, payment of $419,500, made by claimant to builder were taken. The use of the plans and specifications for the construction of the ship as well as the benefit of inspection prior to the requisition date, August 3, 1917, were also taken over. The contract was not terminated. The direct and immediate result of the requisition orders and acts of the Fleet Corporation was to take from claimant its contract and its rights thereunder.

Id. at 120.

We applied the principles of those cases in our recent decision in Huntleigh USA Corp. v. United States, 525 F.3d 1370 (Fed. Cir. 2008). In that case, a private company that had contracts to provide baggage and passenger screening in U.S. airports brought suit for a taking of its contract rights after Congress federalized the screening functions in 2002. The statute creating the Transportation Security Administration had the effect of terminating all of Huntleigh's screening service contracts at U.S. airports. This court

denied Huntleigh's request for compensation. We held that the government does not "take" a party's contract rights simply because its regulatory activity renders those contract rights valueless. Huntleigh conceded that the government did not actually assume its contracts, and for that reason we held that no takings claim could be predicated on a taking of the contracts. 525 F.3d at 1379.

In attempting to define the property right that was purportedly taken by the regulation at issue in this case, the plaintiffs have provided little beyond the general assertion that the Interior Department interfered with their "exclusive right to use Palmyra as a commercial fishing base." They contend that "the contract entitled PPS to the exclusive occupation and use of certain lands of the atoll (e.g., the base camp)," and refer to a "right to use certain facilities on Palmyra as the base for its commercial fishing operation." The problem with that argument is that the Interior Department's regulation does not prohibit commercial fishing operations on Palmyra—it merely prohibits commercial fishing activity in the surrounding waters.[1] The fact that the government's regulation of activities in the waters surrounding Palmyra may have adversely affected the value of their contract rights to engage in activities on shore is not sufficient to

---

[1]    Although the government characterizes the plaintiffs' claim as a right to engage in commercial fishing in the waters around Palmyra, the plaintiffs have made clear that their takings claim is not based on any claim of a right to fish in the EEZ or in the waters within 12 miles of Palmyra, but rather on their asserted right to operate a commercial fishing operation on Palmyra. We agree with the government that our decision in American Pelagic Fishing Co. v. United States, 379 F.3d 1363 (Fed. Cir. 2004), would foreclose any possible claim that the plaintiffs had a compensable "right to fish" in the EEZ. In American Pelagic, a fishing company asserted a takings claim because of the loss of its fishery permits. After reviewing the history of the pertinent legislation, we concluded that there is no "historical common law right to use vessels to fish in the EEZ," id. at 1380, and we therefore held that American Pelagic "did not and could not possess a property interest in its fishery permits," id. at 1374.

constitute a compensable taking. While at this stage of the proceedings we must accept the facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff, Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991), the complaint must allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief, Bell Atl. Corp. v. Twombley, 127 S. Ct. 1955, 1966 (2007). The complaint in this case fails to do so.

Our decision in Colvin Cattle Co. v. United States, 468 F.3d 803 (Fed. Cir. 2006), addressed a claim analogous to the plaintiffs' claim in this case. In that case, a ranch owner argued, inter alia, that the government's refusal to allow grazing on federal land near the ranch had reduced the value of the ranch and thus constituted a taking of the ranch. Id. at 808. We rejected that claim, holding that the fact that the ranch may have lost value because of the government's grazing restriction was "of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest." Id. Because the ranch owner had no property right to graze cattle on federal land, the government's prohibition on grazing did not constitute a taking of the ranch owner's property. See also Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1215-16 (Fed. Cir. 2005) (frustration of heliport operator's business expectations due to new federal air traffic restrictions in the vicinity of the heliport did not constitute a compensable taking). The same analysis applies to the plaintiffs' claim that the government's prohibition on commercial fishing in the waters surrounding Palmyra has taken their rights to run a commercial fishing operation on the island. The ban on fishing may have reduced the value of the plaintiffs' license to

operate on the island, but that reduction in value, as in Colvin Cattle, is not the result of a compensable taking of any cognizable property interest.

The plaintiffs rely on two of this court's cases, but those cases are distinguishable. In United Nuclear Corp. v. United States, 912 F.2d 1432 (Fed. Cir. 1990), United, a uranium mining company, had a mining lease on Navajo land and submitted a mining plan to the Secretary of the Interior for approval. The Secretary, however, refused to approve the mining plan until the Navajo Tribal Council approved the plan, and the Council declined to do so without the payment of additional funds to the Tribe. The mining leases expired without United having been able to conduct any mining. United then brought an action against the government, arguing that the Secretary's refusal to approve the mining plan constituted a compensable taking. Because United had a leasehold interest in the minerals to be mined, see 912 F.2d at 1437, there was no question that it had a property interest that was directly affected by the government's action. The question before the court was whether the government's action constituted a taking of that property interest. The court held that it did.

The court in United Nuclear noted that the economic impact of the Secretary's action was to cause United to lose not only all of its investment in the mining operation, but also all of its prospects for profit. 912 F.2d at 1435-36. The court further held that the Secretary's refusal to approve the mining plan "seriously interfered with United's investment-backed expectations by destroying them." Id. at 1437. And in assessing the character of the government's action, the court stated that "[t]he record leaves no doubt that the real reason for the Tribe's refusal to approve United's mining plan was an attempt to obtain substantial additional money from United." Id. The Secretary's action,

according to the court, "reflects . . . an attempt to enable the Tribe to exact additional money from a company with whom it had a valid contract." Id. at 1438. Accordingly, the court held that the Secretary's action had taken United's leases and that United was entitled to compensation.

The difference between that case and this one is dramatic. The Secretary's action in United Nuclear effectively terminated a recognized real property interest—United's mining leases. United Nuclear was not a case in which a regulation of other property made United's mining operation more difficult or more expensive. Because there is no such direct restraint on any property interest held by the plaintiffs in this case, United Nuclear is of no assistance to them.

The second of the two cases on which the plaintiffs place their main reliance is Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003). In that case a takings claim was brought by real estate owner-developers who had entered into a federal program to construct and operate low-income housing projects. As part of the program, the owners financed the construction of the low-income housing projects with federally guaranteed mortgage loans. Consistent with federal regulations and the owners' agreements with the government, the mortgage contracts provided that the owners could prepay their 40-year mortgages after 20 years. After most of the 20-year period had expired, Congress became concerned that the owners would exercise their prepayment rights and remove the projects from the low-income housing market. Accordingly, Congress enacted legislation that nullified the prepayment provision of the contracts. The result of the legislation was that the owners could not "regain normal

rights of ownership" and had to remain in the government-regulated low-income housing program.  Id. at 1327.

Under those circumstances, this court held that Congress's actions constituted a taking of the owners' property for which compensation had to be paid.  The "distinct property interest" that was taken in Cienega Gardens was the developers' "real property rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years."  331 F.3d at 1328.  The owners gave up certain rights during the first 20 years of their mortgages, but had retained the right to regain their full ownership rights after that period by prepaying the mortgages.  Id. at 1329. The court ruled that by enacting legislation that barred the developers from exercising their options to prepay their mortgages, Congress had in effect requisitioned the developers' property for up to 20 more years of service as low-income housing. Although the relationship between the government, the mortgagees, and the developers was governed by a complex web of contracts, statutes, and regulations, the court viewed the challenged legislation as having appropriated a real property right that the developers enjoyed before the legislation but not afterwards.  In essence, the court held, the statutes authorized what amounted to a traditional appropriation of real property rights, just as if the government had ordered the owners to continue devoting their properties to low-income housing use after their contractual obligation to do so had expired.  By altering the regulatory agreements as they applied to the owners, the government ultimately extended an encumbrance upon the owners' rights to use their

property beyond the 20-year burden they had bargained for. The court characterized that alteration as a taking.[2]

The plaintiffs here have not alleged that the government has altered their contract rights in a way that affects their underlying property rights, as in United Nuclear and Cienega Gardens. They also have not alleged that the government has stepped into the shoes of a contracting party so as to appropriate that party's contract rights, as the Supreme Court discussed in Omnia and Brooks-Scanlon. Instead, the plaintiffs rely on United Nuclear and Cienega Gardens principally to support their argument that a taking has occurred in this case because the government "targeted" their contract rights in order to promote the interests of another party, The Nature Conservancy. To be sure, once it is established that a recognized property interest has been affected by governmental regulation, governmental "targeting" may make it more likely that the destruction of property rights will be regarded as appropriative, rather than merely the incidental effect of lawful regulation directed at a different purpose. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 543 (2005) (referring to regulation that "single[s] out" and "burden[s]" the owner of property). In Cienega Gardens, for example, it was important that the statutes in question "intentionally defeated the Owners' real property

---

[2]    In a subsequent appeal addressing the rights of different parties, this court held that the earlier Cienega Gardens decision did not have the effect of resolving the takings issue for all other similarly situated plaintiffs. See Cienega Gardens v. United States, 503 F.3d 1266 (Fed. Cir. 2007). The court in that case ruled that before concluding that a compensable taking of those parties' property had occurred, the trial court needed to consider the effect of the subject legislation on the property as a whole, the offsetting benefits provided by that legislation, the duration of the legislation, and whether the private parties had a reasonable, investment-backed expectation that they would have the option to repay their mortgages after 20 years. See St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1386 n.5 (Fed. Cir. 2008).

rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years." 331 F.3d at 1328. If the owners had been prevented from prepaying their mortgages as a result of a change in their economic circumstances flowing from unrelated, general changes in the tax code, for example, it is far less likely that the court would have found the governmental action to constitute a compensable taking. But the fact that the government regulates in response to a particular party's conduct or the conduct of a group of which the party is a member is not enough even to trigger an inquiry into whether the government's conduct constitutes a taking unless the government's action interferes with some recognized property right enjoyed by that party.

The plaintiffs' "targeting" argument runs afoul of well-settled case law, as reflected in several decisions from the Supreme Court and this court. In Omnia, for example, the United States requisitioned the steel company's entire production of steel plate for the year 1918 and "directed that company not to comply with the terms of [Omnia's] contract." 261 U.S. at 507. Notwithstanding that the government's action was specifically directed at Omnia, the Court held that the destruction of the contract did not constitute a compensable taking within the meaning of the Fifth Amendment.

Similarly, in Huntleigh, 525 F.3d 1370, Congress's decision to substitute the Transportation Security Administration for the private airport screening companies clearly targeted the private companies in that the legislation was designed to replace their contract services with services performed by federal agents. Yet the fact that the legislation was specifically directed at replacing the private companies did not affect the court's conclusion that there was no taking. And in Mitchell Arms, Inc. v. United States,

7 F.3d 212 (Fed. Cir. 1993), the court held that a prohibition on the importation of assault rifles did not constitute a compensable taking of the plaintiff's contracts to purchase such rifles for importation, even though the prohibition was directly targeted at importers of assault rifles, such as the plaintiff.

The problem with the plaintiffs' takings theory in this case, as well as their claim that "targeting" converted an otherwise innocuous regulation into a compensable taking, can be illustrated by a hypothetical case that contains all the essential elements of this case without the complicating details that tend to obscure the analysis. Suppose that a business that offers "outdoor adventures" obtains rights from a private party to build a facility next to a federally owned national wilderness area for the purpose of attracting adventurers who are interested in hiking in the wilderness area. Suppose further that the government, being concerned that the influx of large numbers of hikers will disrupt the wilderness area, closes the wilderness area to all hikers or strictly limits the number of hikers who can enter the area. In that event, no property right of the business has been taken, even if the government acted in direct response to the prospect of having a hiking tourism business next to the wilderness area. To be sure, the expectation of the outdoor adventure company has been disappointed, but it is not an expectation that was based on any property right that was taken, and thus the government did not effect a taking for which compensation must be paid. While it might be different if the government regulated activities on a private individual's property—in the example, if the government were to prohibit private landowners from running a hiking business within 20 miles of a wilderness area—that is another matter altogether from the government regulating activities on its own property, or property over which it has full control, even if

that regulatory action disappoints the expectations of nearby property owners. Accordingly, even if the Interior Department regulation in this case is regarded as "targeted" at the plaintiffs, it regulated conduct as to which they had no protectable property interest, and it therefore did not constitute a taking for which compensation had to be paid.

III

There are two remaining issues that must be resolved. First, at oral argument, the plaintiffs asserted that the Interior Department regulation would interfere with their right to use the pier on Palmyra. In the trial court, however, the plaintiffs asserted that the government's regulation did not affect activities on the "emergent lands or fixtures appurtenant thereto." Because the question of the use of the pier does not appear to have been put into issue in the trial court, we have no reason to consider it here. Certainly there is nothing on the face of the regulation that suggests any restriction on the use of the pier, and if the plaintiffs were concerned about the use of the pier they could have obtained clarification as to the application of the regulation in that respect.

Second, the plaintiffs have raised a question as to whether the regulation affects the right of their fishing vessels to traverse the 12-mile zone surrounding Palmyra that is governed by the Interior Department regulation. In their complaint, the plaintiffs alleged that the Interior Department regulation "restricted public access to Palmyra . . . thereby barring Plaintiffs from entering Palmyra." The plaintiffs have not spelled out the property interest underlying that assertion in any detail. However, it can be interpreted as a claim that the government has denied them an easement of necessity relating to their contract-based interests on Palmyra.

An easement of necessity has been recognized as a compensable property interest. For example, in Bydlon v. United States, 175 F. Supp. 891, 896 (Ct. Cl. 1959), our predecessor court considered whether a Presidential Executive Order that prevented owners of remote resorts within a national forest from enjoying reasonable access to their properties constituted a taking. In light of the "traditional doctrine of ways of necessity," the court observed that there is a general rule that the owners of property enjoy a right of reasonable access to their property. Id. at 897-98. While the owners retained a method of access "using wilderness trails and waters by packhorses, canoes, and walking," the court determined that "such a method of access would be unreasonable and would destroy [plaintiff's] property for resort purposes" as "[t]he resort was planned exclusively with air access in mind." Id. The court thus concluded that "the United States has taken, under the guise of its police power, a property right of the plaintiffs . . . consisting of a way of necessity to their properties." Id. at 900.

Our predecessor court applied the doctrine of necessity to another takings claim some years later, this time with respect to access to an island. See Laney v. United States. 661 F.2d 145 (Ct. Cl. 1981). The court described the facts in that case as concerning "an effort by the government to utilize its control over navigable waters to deny any meaningful access to the island whatsoever. The government's purpose appears to be, or may be, to keep it in its pristine state." Id. at 146. In that case, the government had argued that its authority to regulate activities on the water allowed it to prohibit transit over the water to the island. Id. at 147-48. The court rejected that assertion, noting:

> If defendant is correct, the just compensation clause of the fifth
> amendment has but little effect in protecting island property. Defendant is

> free to add islands to its system of parks, national seashores, recreational areas, and wildlife preserves, without cost to it. We could enter summary judgment for defendant solely on the admitted fact that the property allegedly taken is an island.

Id. at 148. The court noted the parallel between an island and a city block surrounded by public streets. In the latter case, the court explained, "if his access to his block on all four sides is cut off, that is a taking, and if authorized is compensable under the just compensation clause." Id. at 149. In light of those precedents, a regulation that prevents a property owner from accessing private property would implicate a cognizable property interest for purposes of the Fifth Amendment.

In this case, the government responded to the plaintiffs' claim by arguing in the trial court that "[t]he plain language of the notice does not prohibit plaintiffs' ships from approaching Palmyra, and the plaintiffs have not alleged or provided evidence that even one of their ships was ever turned away from the refuge." The plaintiffs did not contest that assertion or otherwise offer anything to suggest that the Interior Department had interpreted the regulation to prohibit access by fishing vessels to the plaintiffs' facilities on Palmyra. There is nothing in the regulation that by its terms restricts the plaintiffs' right to cross the refuge to reach their base of operation on the island. Absent any reason to believe the government interpreted the regulation to bar the plaintiffs from reaching their facilities, they have failed to make a sufficient allegation that the government has taken that right. We therefore have no occasion to decide whether the plaintiffs' contract rights with regard to activities on the island carried with them the right of access to the island and whether a restriction on such access would have constituted a compensable taking.

AFFIRMED.