# United States Court of Appeals for the Federal Circuit

2008-5084

SCHOONER HARBOR VENTURES, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

William Lee Guice III, Rushing & Guice, P.L.L.C., of Biloxi, Mississippi, argued for plaintiff-appellant.  Of counsel was Lauren Sonnier, of Ocean Springs, Mississippi.

Robert J. Lundman, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief was Ronald J. Tenpas, Assistant Attorney General.

Appealed from:  United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit


2008-5084


SCHOONER HARBOR VENTURES, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


Appeal from the United States Court of Federal Claims in case no. 06-CV-00087, Judge Marian Blank Horn.

_____

DECIDED:  June 16, 2009
_____


Before NEWMAN, SCHALL, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

This case concerns the issue of whether the property of the plaintiff, Schooner Harbor Ventures, Inc. ("Schooner Harbor"), was taken by the United States, such that it must pay just compensation under the Fifth Amendment.  The United States Court of Federal Claims ("trial court") granted summary judgment for the Government on the ground that Schooner Harbor had failed to identify a cognizable property interest that had been affected by government action.  Because we find that Schooner Harbor did identify a cognizable property interest, namely fee title to land that could not be

developed without regulatory compliance, we reverse and remand for further proceedings consistent with this opinion.

BACKGROUND

Schooner Harbor purchased eighty-two acres of land adjacent to the Mississippi Sandhill Crane Natural Wildlife Refuge ("Refuge") in 2000 for $963,802.51.[1]  Shortly thereafter, the United States Department of the Navy ("Navy") began a search for an appropriate site for development of 188 housing units for Navy personnel and their dependants assigned to Naval Station Pascagoula.  The plaintiff's property, referred to as Site 28, was among those considered in the final stages of the project planning.

To comply with the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347, the Navy was required to prepare an Environmental Assessment.  In doing so, the Navy contacted the Daphne, Alabama field office of the United States Fish and Wildlife Service ("FWS") concerning the proposed development and its potential impact on Site 28.  Through a series of letters, FWS informed the Navy that construction of the housing on the Schooner Harbor property would impact the Mississippi Sandhill Crane.  It was determined preliminarily that approval of the project could be obtained, but it would be contingent on appropriate mitigating steps being taken.  In particular, approximately ninety acres of replacement wildlife habitat would be required to be added to the Refuge in order to offset the impact on the endangered species.

On August 20, 2001, the Navy requested a formal Section 7 consultation from FWS concerning the project.  Section 7 of the Endangered Species Act provides that federal agencies must consult with the Secretary of the Interior to ensure that their

---

[1]  In a series of transactions not at issue, it resold approximately 8.15 of those acres for $430,000 in less than a year.

actions will not "result in the destruction or adverse modification of habitat of [any endangered] species which is determined by the Secretary . . . to be critical." 16 U.S.C. § 1536(a)(2) (2006). FWS provided a Biological Opinion on February 12, 2002, concluding specifically that the Navy could go forward with the project without harming the cranes because, "[a]lthough critical habitat will be impacted in one location . . . it will be enhanced, protected, and managed in another location by acquisition of another property of equivalent or better habitat value." This referred to an unrelated parcel of seventy-seven acres of land that FWS required to be added to the Refuge in order to mitigate the environmental impact.

On April 17, 2002, Schooner Harbor and the Navy contracted for the sale of the property for $1.9 million. Schooner Harbor's obligations included transferring Site 28 to the Navy and the seventy-seven acre off-site parcel to FWS for addition to the Refuge. On May 3, 2002, Schooner Harbor transferred both parcels to the Government (the Navy and FWS, respectively).

Schooner Harbor subsequently filed the complaint in this case, alleging that FWS's regulations "effectively deprived [Schooner Harbor] of all productive and beneficial use of the Property by virtue of the requirement to purchase additional off-site property at the same value of the Property at issue in order to sell and develop the Property." The Government moved for summary judgment, which the trial court granted on two alternative grounds. Schooner Harbor Ventures, Inc. v. United States, 81 Fed. Cl. 404, 412–15 (2008).

First, the court stated that the "property interest the plaintiff claims was taken in this case is the plaintiff's interest to sell its property to the Navy for the development of a

housing project, without conditions or additional financial burden." Id. at 412. The court considered whether this was a compensable property right, and determined that it was not.

Second, the court considered how the identified property interest had been affected by the relevant government action, which it viewed as the Navy's purchase of land subject to conditions. Id. at 414. The court found that the Government was acting in its "proprietary" rather than its "sovereign" capacity when it did so. Id. That is, the Navy's imposition of a term of sale related to the Government's behavior as a purchaser, not as a sovereign. Because the court characterized the Government's behavior as commercial, it reiterated that the takings claim must fail. Id. at 414–15.

Schooner Harbor timely appealed to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3) (2006), as this is an appeal from a final judgment of the Court of Federal Claims. The Court of Federal Claims had jurisdiction pursuant to the Tucker Act. 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act waives sovereign immunity and provides jurisdiction for certain types of claims, including, as relevant here, where there is a money-mandating provision on which the plaintiff may base its recovery. Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005). In this case, that provision is the Fifth Amendment. Moden v. United States, 404 F.3d 1335, 1341 (Fed. Cir. 2005).

## DISCUSSION

"We review the Court of Federal Claims' grant of summary judgment without deference." GHS Health Maint. Org., Inc. v. United States, 536 F.3d 1293, 1296 (Fed. Cir. 2008) (internal quotation marks omitted). Summary judgment is appropriate when, making all reasonable inferences in favor of the non-moving party, there exists no

genuine issue of material fact for trial.  See Ct. Fed. Cl. R. 56(c)(1); Am. Pelagic Fishing

Co. v. United States, 379 F.3d 1363, 1370–71 (Fed. Cir. 2004).

The Fifth Amendment prevents the Government from taking private property for

public use without just compensation.  U.S. Const. amend. V.

> We have developed a two-part test to determine whether a
> taking has in fact occurred.  First, as a threshold matter, the
> court must determine whether the claimant has established a
> property interest for purposes of the Fifth Amendment. . . . If
> the claimant fails to demonstrate the existence of a legally
> cognizable property interest, the courts [sic] task is at an
> end.

Am. Pelagic, 379 F.3d at 1372 (citations omitted).  "[T]he Constitution does not itself

create or define the scope of 'property' interests protected by the Fifth Amendment.

Instead, 'existing rules and understandings' and 'background principles' derived from an

independent source, such as state, federal, or common law, define the dimensions of

the requisite property rights for purposes of establishing a cognizable taking."  Air

Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (internal

quotation marks omitted).

If the claimant identifies a cognizable property interest, the court must proceed to

the second part of the analysis: "whether the governmental action at issue amounted to

a compensable taking of that property interest."  Am. Pelagic, 379 F.3d at 1372.  The

Supreme Court has provided an analytical framework to assess regulatory takings

claims in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).

Penn Central considered and balanced three factors: (1) economic impact, (2)

reasonable investment backed expectations, and (3) the character of the government

action.  Penn Central provides an ad hoc analysis allowing holistic consideration of the

relevant factors. On the other end of the analytical spectrum stands <u>Lucas v. South Carolina Coastal Commission</u>, 505 U.S. 1003 (1992), establishing the counterpoint of regulatory taking—namely the categorical rule for regulatory taking. This case falls somewhere between these two points within the latitude provided by <u>Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency</u>, 535 U.S. 302 (2002). But our analysis must begin with the cognizable property interest subject to such regulatory restriction.

The trial court premised its decision on two different grounds. Both were predicated on an erroneous understanding of Schooner Harbor's claimed property interest and a related misidentification of the relevant regulatory government action. The court explained that the "property interest the plaintiff claims was taken . . . is the plaintiff's interest to sell its property to the Navy for the development of a housing project, without conditions." <u>Schooner Harbor</u>, 81 Fed. Cl. at 412. This was the relevant property interest, the court stated, because "[t]he parties jointly have agreed that the preliminary issue in this case is '[w]hether Plaintiff possessed, at the time of the alleged taking, a Fifth Amendment compensable right to sell its property to the United States without any conditions being imposed on the sale.'" <u>Id.</u> at 408 (internal quotation unattributed). After a careful analysis, it then found that "this interest is not a compensable property right." <u>Id.</u> at 412.

Schooner Harbor, however, did not agree that such a right was the relevant interest for the court's takings analysis. To the contrary, in its response to the motion for summary judgment at issue here, Schooner Harbor stated, "The Plaintiff has never claimed that it acquired a specific right to sell to the Navy without restriction. The

Plaintiff asserts however that with its right of alienation and fee simple ownership it had the right to sell to any party." Resp. to Mot. for Summ. J. at 9, <u>Schooner Harbor</u>, No. 06-CV-00087 (Fed. Cl. Dec. 7, 2007). Thus, Schooner Harbor alleged that the relevant property interest was its fee title to Site 28, and that the relevant government action was FWS's decision to regulate development and sale of the parcel.

This statement is consistent with Schooner Harbor's complaint, in which it alleged that it was an owner in fee, and that "[t]hrough the <u>regulations imposed by the Defendant, USFWS</u>, the Plaintiff was effectively deprived of all productive and beneficial use of the Property."[2] Compl. at 6 ¶ XXIV, <u>Schooner Harbor</u>, No. 06-CV-00087 (Fed. Cl. Feb. 3, 2006) (emphasis added).[3] Schooner Harbor further alleged that "the <u>USFWS</u> required the Plaintiff to . . . expend the cost of Three Hundred Twelve Thousand, Five Hundred Dollars ($312,500.00) in order to sell the Property." <u>Id.</u> at 4 ¶ XVI (emphasis added). While Schooner Harbor made reference in the complaint to its sale to the Navy, it did not claim that the Navy had taken any property interest.

The trial court's error on this matter appears to stem from two sources. First, in the Joint Statement of Issues of Law the parties agreed that "[w]hether Plaintiff possessed, at the time of the alleged taking, a Fifth Amendment compensable right to sell its property to the United States without any conditions being imposed on the sale" was "an issue of law." Joint Statement of Issues of Law at 1, <u>Schooner Harbor</u> No. 06-

---

[2]      Schooner Harbor maintained this argument in its briefing on Summary Judgment, including a section entitled "Schooner Harbor Had a Right to Economically Exploit the Land." Resp. to Mot. for Summ. J. at 6.
[3]      Although the language of the complaint might suggest that a per se taking has been alleged under the framework in <u>Lucas</u>, 505 U.S. 1003, at oral argument Schooner Harbor conceded that it was alleging a taking only under the balancing test announced in <u>Penn Central</u>, 438 U.S. 104. <u>See</u> Oral Arg. at 8:07–8:28, <u>available at</u> http://oralarguments.cafc.uscourts.gov/mp3/2008-5084.mp3 (Jan. 8, 2009).

CV-00087 (Fed. Cl. July 25, 2007). They did not agree, as the trial court stated, that it was "the preliminary issue." Schooner Harbor, 81 Fed. Cl. at 412. Schooner Harbor did not even expressly agree that this was a relevant question, only that it was a question of law rather than fact.[4] A party does not fundamentally alter its claim by conceding that a question is one of law rather than fact.

The second source of the trial court's error was a lack of clarity in Schooner Harbor's arguments. In particular, Schooner Harbor has consistently conflated the right to sell land with the right to develop land. Nothing in Schooner Harbor's allegations or briefs suggests that either FWS or the Endangered Species Act has anything at all to say about who should own Site 28, or how easily the land should change hands. Thus, the only possible direct limitation on its right of alienation was, as the trial court found, the inability to sell without conditions. Indeed, Schooner Harbor explicitly alleged that it could not sell to the Navy without meeting the Navy's conditions, and that FWS's determination of the scope of those conditions constitutes a taking. Compl. at 5 ¶ XIX–XX. The trial court appropriately analyzed and disposed of this "property" right.

However, Schooner Harbor also alleges the right to develop its land, irrespective of any sale. See Compl. at 2 ¶ VI ("development rights were an integral part of the Property's title and value"); id. at 3 ¶ IX ("development of the Property was not allowed"); id. at 5–6 ¶ XXI ("USFWS' determination under the Endangered Species Act insofar as it establishes requirements . . . which preclude the development of the Property . . . have affected [sic] the taking of the Plaintiff [sic]"). This alleged regulation of Schooner Harbor's right to develop Site 28 would have an obvious impact on any

---

[4] The statement's inclusion in the document does imply that it was relevant, but only to one party—the Government.

subsequent sale, regardless of the purchaser's identity—a development-restricted parcel commands a lower price. A lower sale price, of course, is not a restriction on the right of alienation, but rather one effect of a regulation on the right to develop. A detailed reading of Schooner Harbor's position below and on appeal thus reveals that this alleged regulation of the right to develop Site 28 is also asserted as a taking. See Compl. at 2 ¶ VI ("Plaintiff fully expected to develop the Property for sale, and/or sell the Property with full rights of future development.").

The right to develop one's land is clearly cognizable, as the trial court acknowledged. See Schooner Harbor, 81 Fed. Cl. at 413 ("The court does not disagree with the plaintiff's assertion that as a fee simple owner of the property, '[p]laintiff had the right to sell and develop the Property.'" (internal quotation unattributed)); see also Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002) (acknowledging that an Endangered Species Act restriction on a fee owner's use of its land related to a cognizable property interest, and dismissing under the second prong, the nature of the government action). On occasion, courts have recharacterized the relevant property interest based on the nature of the government action asserted. For example, in Palmyra Pacific Seafoods, L.L.C. v. United States, 561 F.3d 1361, 1366–67 (Fed. Cir. 2009), the plaintiff asserted that the relevant property right was its contractual right to use its leased land for commercial fishing operations. This court rejected that argument, stating that "the Interior Department's regulation does not prohibit commercial fishing operations on Palmyra—it merely prohibits commercial fishing activity in the surrounding waters." Id. at 1366. Thus, after further discussion, the court concluded that the Interior Department "regulated conduct as to which [plaintiff] had no

protectable property interest." Id. at 1370. Here, there is no such disconnect between the claimed property interest and the alleged regulation of that interest, and thus the relevant property interest remains Schooner Harbor's right to develop Site 28.

Schooner Harbor alleges that FWS prohibited development by threatening enforcement of the Endangered Species Act. Compl. at 3, 5–6 ¶¶ IX–X, XXI–XXIV (alleging that development of Site 28 without mitigation would "result in the invocation of an enforcement of certain sections of the Endangered Species Act as set forth in a letter from [FWS to the Navy]"). In the letter cited by the complaint, FWS stated that private development would require an "incidental take permit" under Section 10 of the Endangered Species Act—that is, that private development would implicate Section 9's generally applicable prohibition on "take" of an endangered species. J.A. 170; see 16 U.S.C. §§ 1538–1539. Schooner Harbor's claim, therefore, is that Site 28 could not be developed by anyone given FWS's factual determination about the effects of the development of Site 28 on the endangered cranes.

Drawing all reasonable inferences in favor of Schooner Harbor, we conclude that Schooner Harbor's claim does identify a cognizable property interest—its right to develop its land—and that it has plausibly alleged that FWS has, by regulation, affected that right. The trial court noted in passing that FWS had regulated the Navy, as opposed to Schooner Harbor. Schooner Harbor, 81 Fed. Cl. at 413. We do not hold that FWS has in fact regulated Schooner Harbor's use of Site 28 pursuant to the Endangered Species Act, rather than simply regulating the Navy. This issue does not affect the nature of the property interest asserted, however, but rather affects ripeness. See, e.g., Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172,

186 (1985) ("[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue."). We note only that the FWS letter referenced in the complaint makes reference to the fact that FWS's factual determinations have some impact on the permissibility of <u>private</u> development. J.A. 170. The trial court must therefore consider whether the case presents a ripened claim that FWS's enforcement of the Endangered Species Act, such as it was, amounts to a compensable taking.

The fact that FWS's actions took place during negotiations for a sale to the Navy does not change the nature of the fundamental property interest asserted, nor does it change Schooner Harbor's allegations that it was FWS that "took" its property rights. Assuming, arguendo, that FWS's evaluation of Site 28 resulted in a sufficiently final and binding conclusion that Schooner Harbor could not develop the property, and that the regulation was sufficiently severe to warrant compensation under the <u>Penn Central</u> factors, the Government could not escape liability by purchasing the property at the lower, development-restricted price. The trial court's analysis improperly focused on an inaccurate characterization of the relevant property interest and a related mischaracterization of the relevant government regulatory restriction—the proper focus is on FWS's regulation of development (such as it was), not on the Navy's purchase.

On remand, therefore, the trial court should consider this alleged taking through the frameworks summarized by the Supreme Court in <u>Lingle v. Chevron U.S.A., Inc.</u>, 544 U.S. 528, 537–40 (2005) (summarizing the <u>Penn Central</u> analysis, the <u>Lucas</u> per se framework, and the "exaction" rules in <u>Dolan v. City of Tigard</u>, 512 U.S. 374 (1994)).

We note that at oral argument, counsel for Schooner Harbor conceded that this case does not state a claim for either a physical or a per se regulatory taking, and therefore that the analysis in Penn Central should apply (assuming the claim is ripe). Oral Arg. at 8:07–8:28, available at http://oralarguments.cafc.uscourts.gov/mp3/2008-5084.mp3 (Jan. 8, 2009). Thus on remand, the Penn Central factors, including the economic impact on the plaintiff of the regulations, the impact on Schooner Harbor's reasonable, investment-backed expectations, and the nature of the government action, will be relevant to the analysis. Penn Central, 438 U.S. at 124–28.

An additional consideration may arise on remand. The trial court indicated that because the critical habitat designation occurred in 1977, subjecting the property to certain regulatory restrictions, and Schooner Harbor did not purchase the land until 2000, it "stretches the credulity of the court that plaintiff, as a real estate developer, did not do due diligence and was not aware of the protected status of the land at issue." Schooner Harbor, 81 Fed. Cl. at 414. Schooner Harbor's knowledge of the regulation is not per se dispositive, although it is a factor that may be considered, depending on the circumstances. "A blanket rule that purchasers with notice have no compensation right when a claim becomes ripe is too blunt an instrument to accord with the duty to compensate for what is taken." Palazzolo v. Rhode Island, 533 U.S. 606, 628 (2001) (rejecting the argument that one who acquires title after the relevant regulation was enacted could never bring a takings claim). Consequently, the trial court must consider if and when any claim ripened as well as all of the factors relevant to Schooner Harbor's investment-backed expectations.

CONCLUSION

Because the trial court's grant of summary judgment was based on its misidentification of the asserted property right and its related misunderstanding of the relevant government action, we reverse and remand for proceedings consistent with this opinion.

REVERSED AND REMANDED

COSTS

No costs.