**SCHOONER HARBOR VENTURES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 06–87L.**

United States Court of Federal Claims.

April 10, 2010.

---

William L. Guice, III, Rushing & Guice, P.L.L.C., Ocean Springs, Miss., for the plaintiff.

Kelle S. Acock, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant. With her was Ignacia S. Moreno, Assistant Attorney General, Environment & Natural Resources Division. Vicki Mott, Office of the Solicitor, United States Department of the Interior, Atlanta, Georgia and Rebecca Beach, Navy Litigation Office, Washington Navy Yard, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

This is a takings case pursuant to the Fifth Amendment to the United States Constitution. The background and facts of the case are more fully reflected in the opinion on summary judgment issued by this court in *Schooner Harbor Ventures, Inc. v. United States*, 81 Fed.Cl. 404, 404–407 (2008) and in the opinion issued by the United States Court of Appeals for the Federal Circuit on appeal, *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d 1359, 1360–61 (Fed. Cir.2009). The findings of fact of both are incorporated into this opinion. On remand, in a motion to dismiss the complaint, defendant argues that plaintiffs takings claim is not ripe for adjudication. The relevant facts, briefly reiterated below, focus exclusively on the ripeness issue raised by defendant's motion to dismiss.

The Mississippi Sandhill Crane was designated an endangered species [1] in 1973. In 1975, the United States Department of the Interior, Fish and Wildlife Service (FWS) acquired acreage to establish the Mississippi Sandhill Crane National Wildlife Refuge (Refuge), in Jackson County, Mississippi, with subsequent acreage added. In 1977, the FWS established a critical habitat for the Mississippi Sandhill Crane, which also included land outside of the Refuge. In 1998, Schooner Harbor entered into an option contract to purchase 82 acres of property in Jackson County, Mississippi. The 82 acres are within the designated critical habitat of

---

1. The impact of a species being designated as endangered is that it becomes unlawful to "take" the species identified. *See* 16 U.S.C. § 1538(a)(1)(B) (2000). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C § 1532(19) (2000).

the Mississippi Sandhill Crane, and also are adjacent to the Refuge. On January 6, 2000, Schooner Harbor exercised its option to purchase the property, and paid $963,802.51 for the property. In July and August 2000, in three different transactions, plaintiff sold three parcels of about 7.36 acres of its 82 acre parcel, leaving the 74.64 acres at issue in this case. Plaintiff's total sales proceeds for the three parcels amounted to $430,000.00. Schooner Harbor never applied for an incidental take permit pursuant to Section 10 of the Endangered Species Act of 1973, as amended, 16 U.S.C. § 1539 (2000). In addition, neither prior to acquiring the property, nor prior to learning of the Navy's interest in its property, did Schooner Harbor ever inquire of the Fish and Wildlife Service whether development of the property would have an impact on the Mississippi Sandhill Crane, or any endangered species.

From late 2000 through March 2001, the Navy began searching for property in Jackson County, Mississippi suitable to build 188 units of housing for Navy personnel and their families assigned to the Naval Station at Pascagoula. The Navy became interested in Schooner Harbor's property, which was identified as Site 28. Pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (2000), the Navy communicated with the FWS concerning the proposed development of Site 28 for military family housing. The FWS informed the Navy that if Site 28 were to be developed into military family housing, due to the resulting loss of critical habitat for the Mississippi Sandhill Crane, fences and replacement wildlife habitat would be required. In a letter to the Navy, dated July 9, 2001, Schooner Harbor indicated that it had met with the FWS and was exploring parcels of land potentially suitable for habitat replacement. In a letter

dated August 20, 2001, the Navy requested a formal Section 7, Endangered Species Act consultation from the FWS, with respect to the development of military family housing at Site 28. *See* 16 U.S.C. § 1536(a)(2) (2000). On September 20, 2001, the FWS confirmed to the Navy that the formal consultation process had been initiated. On February 12, 2002, the FWS issued its Biological Opinion, which addressed the impact of the Navy's proposed development on Site 28 and the requirement for replacement wildlife habitat if Site 28 were to be developed for military family housing. On April 17, 2002, the Navy contracted with Schooner Harbor to purchase Site 28 for $1,900,000.00. The contract provided as a condition of sale that Schooner Harbor would transfer replacement wildlife habitat to the FWS. For this purpose, Schooner Harbor purchased 77 acres of property for $300,000.00 [2] from a third party and transferred that property to the FWS on May 3, 2002. Site 28 also was transferred to the Navy on May 3, 2002, and subsequently was developed by the Navy into military family housing.

## PRIOR PROCEEDINGS

At the trial level, defendant argued that plaintiff did not possess a compensable, protected property right under takings law. The trial court agreed and granted summary judgment to the defendant. *Schooner Harbor Ventures, Inc. v. United States*, 81 Fed. Cl. at 415 ("For the foregoing reasons, the court finds that the plaintiff has not established it possessed a compensable property interest which could have been taken by the government."). The trial court opinion stated:

The court does not disagree with the plaintiffs assertion that as a fee simple owner of the property, "[p]laintiff had the right to

---

**2.** Broadly summarizing plaintiff's purchase and sale figures, the $300,000.00 Schooner Harbor paid for the 77 acres of replacement habitat, added to the $963,802.51 Schooner Harbor paid for the original 82 acres, produces a total of $1,263,802.51 in purchase prices. Over the next 29 months, beginning with the January 2000 purchase by the plaintiff of the 82 acres, Schooner Harbor sold three small parcels (7.36 acres total) of the 82 acres for a total of $430,000.00, and sold the remainder, the parcel at issue (74.64

acres), to the Navy in May 2002 for $1,900,000.00, or for a total of $2,330,000.00 in sales to Schooner Harbor's benefit. Based on these gross figures, Schooner Harbor's total sale prices ($2,330,000.00) exceeded its total purchase prices ($1,263,802.51) by $1,067,197.49, for the 29 months ending May 2002, when Schooner Harbor closed out its interest in the 82 acres ($2,330,000.00–$1,263,802.51 = $1,067,197.49).

sell and develop the Property." The court also does not dispute the plaintiffs assertion that "[t]hese development rights were an integral part of the Property's title and value." The plaintiff's argument fails in that the plaintiff is asserting that it had the right to sell its property to the government, without conditions imposed, in this instance to meet regulatory burdens imposed on the Navy, by obtaining the mitigation parcel. Whereas, the right to alienate the property is a cognizable property interest, the right to sell the property to the government at a particular price and without conditions is not a cognizable property interest which is protected by the Fifth Amendment.

. . .

The plaintiff's injury does not amount to a taking. . . . Plaintiff did not have an inherent right to sell its property to the government without valid regulatory derivative conditions imposed on the sale. The plaintiffs argument that it did not enjoy the right to alienate its property also is vulnerable because the plaintiff engaged in four separate sales of the adjacent property, despite the location of the property and, in fact, consummated the sale to the Navy of the property at issue.

. . .

The court recognizes that the plaintiff's expectations as to its financial gain with regards to selling the property may have been somewhat frustrated as a result of government regulation, in that the plaintiff may have realized less profit in its sale as a result of the requirement that the plaintiff purchase a mitigation parcel in order to consummate the sale. However, what occurred in this case is no different than any arms length, real estate transaction in which the buyer imposes conditions to finalize a sale.

. . .

In a commercial transaction, such as this one, the buyer has the right to negotiate the terms of the sale. At the time of the sale, the Navy was indisputably bound by Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, and the designation of a Critical Habitat for the Mississippi Sandhill Crane, which required that federal agencies "insure that actions authorized, funded, or carried out by them do not adversely affect this Critical Habitat." 42 Fed.Reg. at 39,986. This requirement was a restriction on the government's behavior as a purchaser. In an arms-length transaction, the mitigation parcel was the buyer's condition that the seller needed to comply with in order to induce the government, in its proprietary capacity, to purchase the property from the plaintiff. The government was under no obligation to purchase the plaintiff's property in particular, nor was the seller obligated to sell to a particular buyer if the buyer imposed conditions on the sale. The plaintiff cannot now rewrite the terms of the agreement through a takings claim, given that the "Government clearly did not utilize its position as sovereign to appropriate private property from its rightful owner." *J & E Salvage Co. v. United States*, 36 Fed.Cl. [192,] 195 [ (1996), *aff'd*, 152 F.3d 945, 1998 WL 133265 (Fed.Cir.1998), *cert. denied*, 525 U.S. 827, 119 S.Ct. 76, 142 L.Ed.2d 59 (1998) ].

*Schooner Harbor Ventures, Inc. v. United States*, 81 Fed.Cl. at 413–15 (other citations omitted).

On appeal, the United States Court of Appeals for the Federal Circuit focused on the difference in plaintiffs right to sell as opposed to the right to develop their land. Regarding the former, although reversing and remanding, the appellate court agreed with the trial court's analysis, stating: "Thus, the only possible direct limitation on its [Schooner Harbor's] right of alienation was, as the trial court found, the inability to sell without conditions. Indeed, Schooner Harbor explicitly alleged that it could not sell to the Navy without meeting the Navy's conditions, and that FWS's determination of the scope of those conditions constitutes a taking. Compl. at 5 ¶ XIX–XX.[3] The trial court

3. Paragraph XIX of Schooner Harbor's complaint states: "On or about August 3, 2001, the

appropriately analyzed and disposed of this 'property' right." *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d at 1364.

The Federal Circuit focused attention on plaintiff's "right to develop its land," which it deemed a cognizable property interest. The Federal Circuit noted that Schooner Harbor "has consistently conflated the right to sell land with the right to develop land," and identified the latter as the appropriate property right to be reviewed, regardless of any sale of the land, as alleged in plaintiff's complaint, paragraphs VI, IX and XXI. *Id.* Paragraph VI of the plaintiff's complaint states: "Plaintiff had the right to sell and develop the Property. These development rights were an integral part of the Property's title and value." Paragraph IX states: "as the Property of the Plaintiff was located within a defined critical habitat of the Mississippi Sandhill Crane, a declared and published endangered species, development of the Property was not allowed." Finally, paragraph XXI states: "USFWS' determination under the Endangered Species Act insofar as it establishes requirements for the development of critical habitats [ ] preclude the development of the Property...." *Id.*

The Federal Circuit continued:

This alleged regulation of Schooner Harbor's right to develop Site 28 would have an obvious impact on any subsequent sale, regardless of the purchaser's identity—a development-restricted parcel commands a lower price. A lower sale price, of course, is not a restriction on the right of alienation, but rather one effect of a regulation on the right to develop. A detailed reading of Schooner Harbor's position below and on appeal thus reveals that this alleged regulation of the right to develop Site 28 is also asserted as a taking. See Compl. at 2 ¶ VI ("Plaintiff fully expected to develop the Property for sale, and/or sell the Property with full rights of future development.").

United States Navy was advised by the USFWS to avoid the purchase of the Property." Paragraph XX of the complaint states: "In order to continue with the sale of the Property to the Navy, the Plaintiff would be required to purchase

. . .

The right to develop one's land is clearly cognizable, as the trial court acknowledged.

. . .

[T]hus the relevant property interest remains Schooner Harbor's right to develop Site 28.

. . .

Schooner Harbor alleges that FWS prohibited development by threatening enforcement of the Endangered Species Act. Compl. at 3, 5–6 ¶¶ IX–X, XXI–XXIV (alleging that development of Site 28 without mitigation would "result in the invocation of an enforcement of certain sections of the Endangered Species Act as set forth in a letter from [the FWS to the Navy]").

. . .

Drawing all reasonable inferences in favor of Schooner Harbor, we conclude that Schooner Harbor's claim does identify a cognizable property interest—its right to develop its land—and that it has plausibly alleged that FWS has, by regulation, affected that right. The trial court noted in passing that FWS had regulated the Navy, as opposed to Schooner Harbor. *Schooner Harbor Ventures, Inc. v. United States*, 81 Fed.Cl. at 413. We do not hold that FWS has in fact regulated Schooner Harbor's use of Site 28 pursuant to the Endangered Species Act, rather than simply regulating the Navy. This issue does not affect the nature of the property interest asserted, however, but rather affects ripeness.... *The trial court must therefore consider whether the case presents a ripened claim that FWS's enforcement of the Endangered Species Act, such as it was, amounts to a compensable taking.*

off-site lands which it could include in its sale package to the United States Navy in order to offset the impact caused by the housing project to designated critical habitats on the Property."

. . .

The fact that FWS's actions took place during negotiations for a sale to the Navy does not change the nature of the fundamental property interest asserted, nor does it change Schooner Harbor's allegations that it was FWS that "took" its property rights. Assuming, arguendo, that FWS's evaluation of Site 28 resulted in a sufficiently final and binding conclusion that Schooner Harbor could not develop the property, and that the regulation was sufficiently severe to warrant compensation under the *Penn Central* factors, the Government could not escape liability by purchasing the property at the lower, development-restricted price.... [T]he proper focus is on FWS's regulation of development (such as it was), not on the Navy's purchase.

*Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d at 1364–66 (emphasis added; other citations omitted).

The Federal Circuit indicated that if the trial court were to find that plaintiffs claim is ripe, then the trial court should proceed with a *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *reh'g denied*, 439 U.S. 883, 99 S.Ct. 226, 58 L.Ed.2d 198 (1978), takings analysis, and review the several factors identified in that United States Supreme Court case, including the economic impact on Schooner Harbor of the Fish and Wildlife Service regulations protecting endangered species; the impact on Schooner Harbor's reasonable, investment-backed expectations; and the character of the governmental action. *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d at 1366 (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. at 124–28, 98 S.Ct. 2646). Also, as addressed by the Federal Circuit, if the plaintiff's takings claim is ripe, the trial court should proceed to consider the impact of the property at issue being designated as critical habitat for the Mississippi Sandhill Crane in 1977, prior to Schooner Harbor's purchase of the property in 2000. *Schooner Harbor Ventures, Inc. v. United States*, 569 F.3d at 1366 (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 628, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001)). At this juncture, defendant moves to dismiss plaintiff's takings claim as not ripe for adjudication, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) (2010).

## DISCUSSION

*Jurisdiction*

Subject-matter jurisdiction may be "challenged at any time by the parties or by the court *sua sponte*." *Folden v. United States*, 379 F.3d 1344, 1354 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2004), *cert. denied*, 545 U.S. 1127, 125 S.Ct. 2935, 162 L.Ed.2d 865 (2005); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006); *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1346 (Fed.Cir.2008); *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (Fed.Cir.1993)); *United States v. Newport News Shipbuilding and Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991); *Thompson v. United States*, 88 Fed.Cl. 263, 266 (2009); *North Star Alaska Hous. Corp. v. United States*, 76 Fed.Cl. 158, 185, *appeal dismissed*, 226 Fed.Appx. 1004 (2007). "In fact, a court has a duty to inquire into its jurisdiction to hear and decide a case." *Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed. Cir.2001) (citing *Johannsen v. Pay Less Drug Stores N.W., Inc.*, 918 F.2d 160, 161 (Fed.Cir.1990)); *see also Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1343 (Fed.Cir. 2007); *View Eng'g, Inc. v. Robotic Vision Sys., Inc.*, 115 F.3d 962, 963 (Fed.Cir.1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not.").

*Ripeness*

The Tucker Act provides this court with exclusive jurisdiction over takings claims over $10,000.00. *See* 28 U.S.C. § 1491(a)(1) (2006); *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1304 (Fed.Cir. 2008) (citing *E. Enters. v. Apfel*, 524 U.S. 498, 520, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998)). However, the Court of Federal

Claims does not have jurisdiction over claims that are not ripe. *See Morris v. United States,* 392 F.3d 1372, 1375–76 (Fed.Cir.2004) (discussing *Howard W. Heck & Assocs., Inc. v. United States,* 134 F.3d 1468 (Fed.Cir. 1998)).

■ In remanding the case to the trial court to review the ripeness of plaintiffs takings claim, the United States Court of Appeals for the Federal Circuit quoted from the United States Supreme Court case of *Williamson County Regional Planning Commission v. Hamilton Bank,* for the rule on ripeness: "[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Schooner Harbor Ventures, Inc. v. United States,* 569 F.3d at 1365 (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)); *see also Palazzolo v. Rhode Island,* 533 U.S. at 618, 121 S.Ct. 2448.

The *Williamson County Regional Planning Commission* case cited by the Federal Circuit elaborated on the need for a final agency decision:

> In *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 101 S.Ct. 2352 (1981), for example, the Court rejected a claim that the Surface Mining Control and Reclamation Act of 1977, effected a taking because:
>
> > There is no indication in the record that appellees have availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance from the approximate-original-contour requirement of § 515(d) or a waiver from the surface mining restriction in § 522(e). If [the property owners] were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions. The potential for such administrative solutions confirms the conclusion that the

> > taking issue decided by the District Court simply is not ripe for judicial resolution. 452 U.S., at 297, 101 S.Ct. 2352 (footnote omitted; brackets in original).

Similarly, in *Agins v. Tiburon, supra,* the Court held that a challenge to the application of a zoning ordinance was not ripe because the property owners had not yet submitted a plan for development of their property. 447 U.S. [255,] 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 [ (1980) ]. In *Penn Central Transp. Co. v. New York City, supra,* the Court declined to find that the application of New York City's Landmarks Preservation Law to Grand Central Terminal effected a taking because, although the Landmarks Preservation Commission had disapproved a plan for a 50-story office building above the terminal, the property owners had not sought approval for any other plan, and it therefore was not clear whether the Commission would deny approval for all uses that would enable the plaintiffs to derive economic benefit from the property. 438 U.S., at 136–137, 98 S.Ct. 2646.

. . .

> As in *Hodel, Agins,* and *Penn Central,* then, respondent has not yet obtained a final decision regarding how it will be allowed to develop its property. Our reluctance to examine taking claims until such a final decision has been made is compelled by the very nature of the inquiry required by the just Compensation Clause. Although "[t]he question of what constitutes a 'taking' for purpose of the Fifth Amendment has proved to be a problem of considerable difficulty," *Penn Central Transp. Co. v. New York City,* 438 U.S., at 123, 98 S.Ct. 2646, this Court consistently has indicated that among the factors of particular significance in the inquiry are the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations. *Id.,* at 124, 98 S.Ct. 2646. Those factors simply cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply

the regulations at issue to the particular land in question.

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. at 186–87, 190–91, 105 S.Ct. 3108 (other citations omitted).

In *MacDonald, Sommer & Frates,* a County Planning Commission denied a developer's proposal for a 159–unit residential subdivision. The complaint alleged that the developer was deprived of all beneficial use of the property. The United States Supreme Court, however, did not reach the issue of whether the property had been taken, because "the holdings of both courts below leave open the possibility that some development will be permitted." *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. 340, 352, 106 S.Ct. 2561, 91 L.Ed.2d 285, *see also* 352 n. 8, 106 S.Ct. 2561, *reh'g denied,* 478 U.S. 1035, 107 S.Ct. 22, 92 L.Ed.2d 773 (1986).[4] As in *MacDonald, Sommer & Frates,* however, despite the sale of four parcels and established development on the Navy parcel, Schooner Harbor has alleged in its complaint that all economically beneficial use for the property was taken by the actions of the FWS pursuant to the Endangered Species Act.[5] In *MacDonald, Sommer & Frates,* the Supreme Court wrote:

> It follows from the nature of a regulatory takings claim that an essential prerequisite to its assertion is a final and authoritative determination of the type and intensity of development legally permitted on the sub-

ject property. A court cannot determine whether a regulation has gone "too far" unless it knows how far the regulation goes.

. . .

Until a property owner has "obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property," "it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interests ha[ve] been destroyed." *Williamson County Reg'l Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (brackets in original).

. . .

Whether the [takings] inquiry asks if a regulation has "gone too far," or whether it seeks to determine if proffered compensation is "just," no answer is possible until a court knows what use, if any may be made of the affected property. (brackets added; footnote omitted).

Our cases uniformly reflect an insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it.

*MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 348–51, 106 S.Ct. 2561 (other

---

4. The majority opinion in *Palazzolo* states "that a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Palazzolo v. Rhode Island,* 533 U.S. at 617, 121 S.Ct. 2448 (quoting *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (Kennedy, J., concurring)). The Supreme Court continued: "Where a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo v. Rhode Island,* 533 U.S. at 617, 121 S.Ct. 2448 (citing *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. at 124, 98 S.Ct. 2646).

5. Schooner Harbor's complaint states:

Paragraph XXI: Thus the Plaintiff was required to sacrifice all economically beneficial use of the Property in the name of the common good. As a result of the USFWS' determination under the Endangered Species Act insofar as it establishes requirements for the development of critical habitats which preclude the development of the Property for any productive or beneficial use and which has denied the Plaintiff all economically viable use of the Property and interfered with the distinct investment backed expectations of the property and have affected the taking of the Plaintiff. (emphasis added).
Paragraph XXIV: Through the regulations imposed by the Defendant, USFWS, the Plaintiff was effectively deprived of *all productive and beneficial use* of the Property by virtue of the requirement to purchase additional off-site property at the same value of the property at issue in order to sell and develop the Property. (emphasis added).

citations and footnotes omitted); *see also Palazzolo v. Rhode Island*, 533 U.S. at 620–21, 121 S.Ct. 2448 ("Under our ripeness rules a takings claim based on a law or regulation which is alleged to go too far in burdening property depends upon the landowner's first having followed reasonable and necessary steps to allow regulatory agencies to exercise their full discretion in considering development plans for the property, including the opportunity to grant any variances or waivers allowed by law. As a general rule, until these ordinary processes have been followed the extent of the restriction on property is not known and a regulatory taking has not yet been established."); *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. at 297, 101 S.Ct. 2352 (Claimants were not permitted to raise complaints "about the manner in which the challenged provisions of the [Surface Mining] Act have been or will be applied in specific circumstances, or about their effect on particular coal mining operations," since variances and waivers had not been sought.).

*Futility*

Section 9 of the Endangered Species Act (codified at 16 U.S.C. § 1538, titled "Prohibited acts"), provides that it is unlawful to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). Private parties seeking to develop property with Endangered Species Act impacts may proceed under Section 10 of the Act (codified at 16 U.S.C. § 1539), titled "Exceptions," and subsection (a), titled "Permits". A private party, such as Schooner Harbor, can request an "incidental take permit" from the FWS. The Secretary of the Interior may permit "any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B).

The parties have stipulated for the purpose of this motion that Schooner Harbor did not consult the FWS prior to purchasing the 82 acres at issue, had no contact with the FWS prior to learning of the Navy's interest in the property, and never applied to the FWS for an incidental take permit in accordance with Section 10 of the Endangered Species Act. In the trial court opinion, the court made several relevant findings, including, that although "the plaintiff planned to market the property as an industrial park," *Schooner Harbor Ventures, Inc. v. United States*, 81 Fed.Cl. at 405, the plaintiff sold off portions of the property, *id.*; and "[t]he plaintiff bought and sold the property without contacting FWS to ascertain whether any subsequent proposed developments or alterations to the property would impact any federally listed species, including the Mississippi Sandhill Crane. Further, the plaintiff has never applied to the FWS for an incidental take permit, in accordance with Section 10 of the Endangered Species Act of 1973, 16 U.S.C. § 1539, regarding the property." *Id.*

Defendant argues that, because plaintiff never applied for an incidental take permit pursuant to Section 10 of the Endangered Species Act, "[t]he FWS therefore never issued or had reason to issue a final agency decision regarding Plaintiff's private development of the property. Thus, Plaintiff has failed to establish that its takings claim is ripe, and the Court must dismiss the claim for lack of subject matter jurisdiction." Plaintiff argues, however, that:

> Once negotiations were entered into with the Navy and the Plaintiff was advised that the Mississippi Sandhill Crane Refuge would assert that the cranes would be harmed by *any* development on the property, any further action by the Plaintiff would have been futile. Any further attempts, more specifically, any initial permit applications submitted by the Plaintiff would have been ineffectual due to the established position of the FWS's permissible uses of the property. Once the permissible uses of the property were known to a reasonable degree of certainty, a takings claim would have ripened. (emphasis in original).

Futility is an exception to the agency final decision requirement for ripeness. *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1315–16 (Fed.Cir.), *reh'g denied* (Fed. Cir.2006).

> [T]he Supreme Court has specifically excused a failure to show finality in the face

of "administrative futility." *Palazzolo,* 533 U.S. at 620, 121 S.Ct. 2448 (citing *Suitum [v. Tahoe Reg'l Planning Agency],* 520 U.S. [725,] 738, 117 S.Ct. 1659, 137 L.Ed.2d 980) [ (1997) ] ("Once it becomes clear that the agency lacks the discretion to permit any development, or the permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened."). A claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process. *MacDonald,* 477 U.S. at 350 n. 7, 106 S.Ct. 2561.

*Anaheim Gardens v. United States,* 444 F.3d at 1315 (other citations omitted); *see also Cooley v. United States,* 324 F.3d 1297, 1302 (Fed.Cir.2003) ("[A] claimant can show its claim was ripe with sufficient evidence of the futility of further pursuit of a permit through the administrative process." (citing *MacDonald, Sommer & Frates v. Yolo County,* 477 U.S. at 350 n. 7, 106 S.Ct. 2561)).

■ Before this court, Schooner Harbor argues the futility of pursuing a permit from the FWS. As indicated above, however, the record reflects that Schooner Harbor took no steps to secure a permit from the FWS for any type or degree of proposed development. Plaintiff apparently saw no need to seek a Section 10 incidental take permit from the FWS for any developmental plans, if indeed plaintiff had any alternative development plans. Plaintiff, nonetheless, argues that given the experience of the Navy with the FWS, any such applications would have been futile. The Navy proceeded under Section 7 of the Endangered Species Act (codified at 16 U.S.C. § 1536(a)(2), (b)(4)). The Navy's Section 7 consultation resulted in an "incidental take statement." For its part, defendant argues that "the incidental take statement issued by the FWS to the Navy under Section 7 did not, and could not, address the scope of private development by Plaintiff or any private third-party purchaser."

Plaintiff points to various FWS letters to the Navy, which culminated in the 77 acre replacement habitat as part of the Navy's plans to develop the 188–unit military family housing complex. In particular, plaintiff notes that, on appeal, the Federal Circuit cited an August 3, 2001 FWS letter to the Navy, which, in addition to addressing development by the Navy, also mentioned private development. Plaintiff states, "the United States Court of Appeals, Federal Circuit pointed out the fact that the FWS letter cited in the Complaint referenced the fact that FWS's factual determinations have some impact on the permissibility of *private* development." (emphasis in original). Plaintiff cannot assert, however, that the FWS statement indicated that no private development would be allowed; the letter merely indicates that there would be "some" impact.

Based on informal consultation with the Navy, the August 3, 2001 FWS letter to the Navy stated that:

If the land remains in private ownership, and use of that land (e.g., development) would result in take of cranes, that take would be prohibited. The only option for allowing take by a private individual that is incidental to an otherwise lawful action, such as development, would be a Section 10(a)(1)(B) permit issued to the landowner, including the development and implementation of a Habitat Conservation Plan, or HCP. The species is losing both critical habitat and other potential crane habitat as a result of accumulated development in Jackson County. (footnote omitted).

The Federal Circuit did not conclude that the plaintiff had been regulated by the FWS, or that a compensable takings claim had resulted. Indeed, the Federal Circuit explicitly stated: "We do not hold that FWS has in fact regulated Schooner Harbor's use of Site 28 pursuant to the Endangered Species Act, rather than simply regulating the Navy." *Schooner Harbor Ventures, Inc. v. United States,* 569 F.3d at 1365. Nonetheless, the plaintiff concludes that Site 28 could not have been developed by anyone, given the FWS discussion on the impact of development on the Mississippi Sandhill Cranes.

Nor does this court construe the FWS' August 3, 2001 letter to the Navy as a final agency decision on a plan for development by private owner Schooner Harbor. The FWS merely summarized Section 10 of the Endangered Species Act (codified at 16 U.S.C.

§ 1539). The letter only indicates that the land is in private ownership, and if the contemplated use of the land would "take" Mississippi Sandhill Cranes, the private landowner should proceed with the incidental take permit process of Section 10 of the Endangered Species Act. The letter does not constitute an advisory FWS decision to Schooner Harbor, but rather a description of the process. Schooner Harbor submitted no plan or proposal to the FWS, and the FWS, therefore, had nothing to consider with regard to possible, private development plans. As to what development plaintiff might have proposed,[6] its impact on the habitat, the FWS' response, or the exercise of the FWS' discretion, the court can only speculate. Even as to the Navy's 188–unit, family housing plan, the FWS employed considerable discretion to allow the Navy development to go forward pursuant to a mitigation plan. Without a formal proposal from plaintiff, and without a final, discretionary decision from the FWS on such plans and proposals, plaintiff's takings claim is not ripe and cannot proceed.

Plaintiff also points to the FWS' February 12, 2002 Biological Opinion, which reviewed the impact of the Navy's proposed, 188–unit family housing complex, and concluded that replacement habitat would be needed. Plaintiff argues that the Biological Opinion based its conclusion and requirement for mitigation on "noise, vibration, pollution and visual disturbance," which would be inherent in any use of the property. However, the FWS' conclusions are tailored to the Section 7 consultation process with the Navy, and with the Navy's specific, proposed 188–unit family housing complex. Plaintiff and the court only can speculate on possible FWS conclusions regarding a proposed, private development plan and a private owner's Section 10 process, based on theoretical, nonspecific, prospective uses for the property. Similarly, other FWS letters to the Navy in the record focused on the Navy's particular use during the Section 7 consultation process, and did not analyze alternative, possible private uses

to which the FWS was not made privy by Schooner Harbor.

 In sum, a final agency decision is needed, to ascertain the nature and extent of permitted development, see MacDonald, Sommer & Frates v. Yolo County, 477 U.S. at 351, 106 S.Ct. 2561; to evaluate what use, if any, may be made of the property, see id. at 350, 106 S.Ct. 2561, and Penn Cent. Transp. Co. v. New York City, 438 U.S. at 136–37, 98 S.Ct. 2646; and to review the type, intensity and specific circumstances of the development, all of which may vary project to project. See MacDonald, Sommer & Frates v. Yolo County, 477 U.S. at 348, 106 S.Ct. 2561, and Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc., 452 U.S. at 297, 101 S.Ct. 2352. Furthermore, the economic impact of the regulation and the extent to which it interferes with reasonable, investment-backed expectations cannot be evaluated until the agency has issued a final decision, see id. at 295, 101 S.Ct. 2352, and Penn Cent. Transp. Co. v. New York City, 438 U.S. at 124, 98 S.Ct. 2646, and the development plan, including required mitigation efforts, if any, are identified. See also Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. at 186, 105 S.Ct. 3108 (raising whether the land retains any reasonable beneficial use); and Palazzolo v. Rhode Island, 533 U.S. at 620–21, 121 S.Ct. 2448 (raising what mitigation might the agency require in its discretion). Absent the private property owner undergoing the permit process and the agency issuing a final decision on the developer's request, there are too many uncertainties associated with possible private uses of the property. The court concludes that plaintiff's takings claim is not ripe.

 The requirement in the Endangered Species Act to obtain an incidental use permit does not automatically result in a per se regulatory taking. The United States Supreme Court has stated:

A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very

---

**6.** Plaintiff no longer owns the land, having sold 74.64 acres to the Navy and three additional

smaller parcels to other individuals.

existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred.

*United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *see also Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1366 (Fed.Cir.) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. at 126–27, 106 S.Ct. 455), *reh'g and reh'g en banc denied* (Fed.Cir.2004).

The claimant in *Howard W. Heck, and Associates, Inc.*, also argued futility, albeit unsuccessfully.

Heck alleges that the mere requirement of an alternatives analysis makes the application process futile because were Heck to submit an alternatives analysis the WQC [water quality certificate] surely would be denied. However, the futility exception simply serves "to protect property owners from being required to submit *multiple* applications when the manner in which the first application *was rejected* makes it clear that no project will be approved." *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 504 (9th Cir.1990) (emphasis in original). In this case, by contrast, Heck's first application was never rejected because it was never complete. Furthermore, the Court of Federal Claims properly disposed of Heck's "futility" argument as lacking any factual foundation because of testimony that the Corps has previously granted permits despite the allegedly insurmountable obstacles of negative agency comments and of the requirement for an alternatives analysis.

*Howard W. Heck, & Assocs., Inc. v. United States*, 134 F.3d at 1472.

In the present case, Schooner Harbor never submitted a first permit application. It would be contrary to the public policy of the Endangered Species Act, designed to protect endangered species, to obviate the need to apply for incidental take permits on specific projects just because another development on adjacent land was denied a permit or, as here, was granted permission to develop, but had to take mitigation measures in order to proceed. The Navy's experience reflects that, depending on the use, type and intensity of a public or private plan or proposal, the exercise of FWS' discretion and mitigation are possible, and the project can go forward. Denial by the FWS of a Section 10 incidental take permit was not a foregone conclusion. The nature of the FWS response, which we do not have in the case of Schooner Harbor, is necessary to proceed with a *Penn Central* regulatory, takings analysis, when all beneficial use of a property is not foreclosed. Again, the Navy's experience suggests that not all beneficial uses of the property at issue necessarily would have been foreclosed by a private plan or proposal for the property. Schooner Harbor's decision to unilaterally bypass the Section 10, incidental take permit process renders its takings claim unripe, and leaves this court without jurisdiction to proceed on plaintiff's claim.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the plaintiff's takings claim as not ripe for adjudication is **GRANTED**. Because plaintiff no longer owns the property at issue, plaintiff has no present right to develop the property or ability to seek an incidental take permit from the FWS. Therefore, plaintiff cannot cure the defect in its case. Plaintiff's takings claim was not ripe and never can be ripe for adjudication. As a result, the Clerk's Office shall **DISMISS** the plaintiff's complaint, with prejudice, and enter judgment consistent with this opinion.

**IT IS SO ORDERED.**